[No. 32385. Department Two. December 3, 1953.]

HERBERT ARNEMAN, *Appellant,* v. ARTHUR ARNEMAN *et al.,* *Respondents.*[1]

[1]Reported in 264 P. (2d) 256.

*Mark M. Litchman,* for appellant.

*Rummens, Griffin & Short* and *Paul R. Cressman,* for respondents.

HAMLEY, J.—In this action involving the affairs of Johnson Manufacturing Co., Inc., of Seattle, Washington, the two brothers who own all of its capital stock are arrayed against each other as plaintiff and defendant.

The suit was brought by the younger brother, Herbert Arneman, who was sixty-one years of age at the time of the trial. He seeks relief both for himself and for the corporation, which he named as a defendant. For himself, he seeks a decree establishing his claim to a one-half interest in the company; an order requiring the corporation to pay him salaries alleged to have been wrongfully withheld; an accounting of corporate profits and losses since May, 1941; an appraisal of the real and personal property and good will of the corporation; and an order of sale of the corporation to the highest bidder at public auction.

For the corporation, plaintiff seeks a decree adjudging the corporation to be the owner of certain real property now held in the name of defendant Arthur Arneman, and a decree requiring Arthur to refund to the corporation certain moneys alleged to have been illegally withheld. In connection with the requested derivative relief, plaintiff asks for

an allowance of fifteen thousand dollars as reasonable attorneys' fees.

In his answer, Arthur, who was sixty-five years of age at the time of the trial, denies numerous allegations of the complaint. He also alleges, affirmatively, that an accounting would be welcome; that the plaintiff has been provided with copies of regular audits and has been permitted to have his own accountant examine the corporate books; that, as stockholder and director, plaintiff consented to the withholding of dividends and reduction in salaries of which plaintiff complains; and that the action is barred by the statute of limitations.

The cause came on for trial before the court, sitting without a jury. At the close of plaintiff's case, defendants challenged the sufficiency of the evidence and moved that the action be dismissed. The motion was granted, and findings of fact, conclusions of law, and a decree of dismissal were thereafter entered. Plaintiff appeals.

A rather complete review of the evidence before us is essential to a proper consideration of the assignments of error.

The two brothers first acquired an interest in the company on May 7, 1941. On that date, their mother died, bequeathing them each 125½ shares of the five hundred outstanding shares of capital stock. The remaining 249 shares were then owned by Mrs. Johnson's four stepdaughters. With regard to the bequest to Herbert and Arthur, Mrs. Johnson's will contains the following proviso:

"That no portion of said stock in the Johnson Manufacturing Company shall be sold at any time during the life of my son, Arthur D. Arneman,—that is to say, rather than placing said stock in trust for subsequent distribution, I do limit the distribution thereof and the right of my said son, Herbert D. Arneman, therein and thereto as hereinabove specified, to the end that neither all nor any part of said Johnson Manufacturing Company stock shall be sold without the written consent of my said son, Arthur D. Arneman."

Mrs. Johnson was apparently led to so limit Herbert's right to sell the stock because he lacked Arthur's stability,

business experience, and demonstrated interest in the company. Arthur had been continuously employed by the company and its predecessor, Seattle Machine Works, for many years. He was serving as general manager at the time of his mother's death.

Herbert, whose formal education stopped with the seventh grade, worked for Seattle Machine Works as a part-time handyman in the early 1930's. He then went to sea, and later was employed as an engineer in a New York hotel. When Mr. Johnson, stepfather of Herbert and Arthur, died in 1933, Mrs. Johnson sent for Herbert, and he returned to Seattle. From then until his mother's death, he was employed by Johnson Manufacturing Company, Inc., as a crane operator, boiler tender and general handyman.

In limiting Herbert's power to sell his stock, Mrs. Johnson may also have had in mind the fact that the 251 shares which the two brothers owned gave them control of the corporation. She had had difficulties with the four stepdaughters regarding the control of the corporation, and this had resulted in litigation. See *In re Johnson's Estate*, 187 Wash. 552, 60 P. (2d) 271, 106 A. L. R. 217.

The circumstances just mentioned also led Arthur to suggest to Herbert, shortly after their mother's death, that they buy the 249 shares held by the stepdaughters. Herbert favored the purchase. Negotiations to effectuate the purchase were then undertaken, and the stepdaughters agreed to sell. Herbert understood that the purchase price was thirty thousand dollars, plus their equity in the family home.

Arthur told Herbert that neither of them would need to put up any cash. He stated that the money would come from their equal shares in the estate, in connection with which they would both sign a promissory note. Herbert assented to this plan and left the matter entirely in the hands of his brother, in whom Herbert had complete confidence. The arrangements were made by Harold Scott, secretary-treasurer of the company, and the sale was effectuated on that basis. Both brothers signed the note. Herbert was unable to state, however, who was the promisee of the note, the

amount thereof, when it was due, or whether it has been paid.

Up to this time, there was no express agreement between the brothers as to how the 249 purchased shares were to be divided between them. However, Herbert thought that the stock would be divided equally. Sometime later, while Herbert and Arthur were having a night session in Scott's office, Arthur and Scott told Herbert that he should accept less shares of the purchased stock than Arthur. They told Herbert that this was desirable so that the two of them would not have disputes and trouble like they had had with the stepdaughters, and so there would be only one head to the company. Herbert, who was sick at the time, thereupon consented to the "retention" of twenty more shares of stock by Arthur than he himself received.

This plan was carried out, and Arthur thus came into possession of 260 shares of capital stock, while Herbert held the remaining 240 shares. The brothers then entered into an agreement dated January 17, 1942, limiting their respective rights to sell the purchased stock in a manner designed to prevent strangers from gaining control of the corporation. In this agreement, it is recited that the parties "own" all of the capital stock in the proportion of 260 shares to Arthur and 240 shares to Herbert.

As soon as Herbert and Arthur became stockholders of the corporation, they elected themselves to the board of directors. At a meeting of the board, held on May 26, 1942, Arthur was elected president of the company, and Herbert was elected secretary. Arthur has continued as president since that time. The minutes of a meeting of the board, held on March 27, 1943, recite that, with all directors present, Herbert resigned as secretary, and Margaret Arneman (daughter of Arthur) was unanimously elected in his place. Herbert testified, however, that he was not present at this meeting. He further testified that he attended only two or three board meetings in the course of nine years.

While Herbert's signature appears on the minutes of board meetings held on January 10, 1942, and May 26, 1942, he did not recall being present at these meetings. It was his

testimony that he signed the minutes of several board meetings at one time several years after the meetings were held. He did not read these minutes, but was told that they were "secretary's reports." Herbert has never had anything to do with the corporate books, office, employment of personnel, or management of the plant. He had never seen the minute book until the trial. He testified that he is not capable of reading a financial statement, and the only such statement he had ever received was the last one issued by the company.

In 1941, the year in which their mother died, Herbert received wages totaling $1,860, and Arthur received a salary of $4,800. From 1942 through 1948, Herbert, who continued his work as a handyman, received an annual salary of $7,-200. Arthur's annual salary for the same years was $20,000. In January, 1949, these salaries were reduced to $3,600 and $12,000, respectively. Arthur had asked for the reductions because of "low business." While Herbert was apparently present at the board meeting at which these reductions were approved, he testified that he did not consent to the reduction of his own salary. From 1941 through 1949, Arthur also received an expense account for entertainment, and auto expense in a company-owned car, aggregating $14,248.42.

At the time Herbert and Arthur became stockholders and directors of the company, business was being conducted on lands leased from King county. The lease was for a term of thirty-five years, terminating on December 5, 1950. The rental payments were forty-five dollars a month, or $540 a year. On May 31, 1943, there was a fire, which destroyed all buildings on the premises except the blacksmith shop and the dock.

Herbert and Arthur then conferred as to the course to be followed. Arthur told his brother that it would be necessary to buy the property from King county before rebuilding, as the lease had only seven more years to run. He also told Herbert that the county would not sell to the corporation, but would sell to Arthur personally. The reason for this, Arthur told Herbert, was that, in addition to the $9,500 purchase price, the purchaser had to pay "a few thousand in

cash without a receipt to some place uptown." Arthur at that time also told Herbert that after he (Arthur) "got his money out," he would turn the tract over to the corporation. Herbert testified that he did not understand the proposed transaction very well, but told Arthur to "go ahead," when the latter said that this was the only way the corporation could be protected.

The total amount which Arthur paid to acquire this tract was never divulged to Herbert, and does not appear in the record before us. The deed conveying this land to Arthur was executed on November 3, 1943. He immediately began charging the corporation five hundred dollars a month rental, and continued collecting such rent up to the time of the trial. Sometime after making this purchase, Arthur, without Herbert's knowledge, purchased from King county another tract, situated across the road from the original tract. The price paid for this second tract is not indicated in the record. The corporation apparently had the use of the second tract without the payment of additional rental.

Herbert knew from the beginning that Arthur was collecting five hundred dollars a month rental from the corporation. Sometime later, and before Herbert learned of Arthur's purchase of the second tract, he asked Arthur when the latter was going to convey the original tract to the corporation. This conversation was had in 1947 or 1948. According to Herbert, Arthur's reply was, "I'll get after it. One of these days I'll fix it."

Arthur has never conveyed this land to the corporation. At the time of its purchase by Arthur, the corporation had in excess of $260,000 in cash on hand, consisting largely of the proceeds of fire insurance.

Herbert became dissatisfied with the treatment he was receiving when, in 1949, his salary was reduced from $7,200 to $3,600. No dividends had been declared since Herbert and Arthur became owners of the business. Herbert testified, however, that he continued to trust Arthur until October, 1948, when he discovered that Arthur had purchased the additional property. The two brothers then conferred, and Arthur told Herbert to indicate a price at which he

would sell out to Arthur. In this connection, Arthur promised to supply Herbert with a financial statement, but this was not forthcoming.

There was no more talk about a sale until November 8, 1950. On that date, Herbert, using the stationery of his attorney, wrote to Arthur, indicating Herbert's desire to sell his stock to Arthur. Arthur's attorney, replying to Herbert's attorney, made reference to Mrs. Johnson's will, and indicated a willingness to "work something out along that line."

On January 4, 1951, Herbert was discharged. He testified that the reason for this was that he would not keep his attorney and accountant off the premises. Shortly thereafter, the attorneys for the two parties conferred regarding a possible purchase of Herbert's stock by Arthur. The best recommendation or offer Arthur's attorney would make was $50,000, with a small down payment and small yearly payments based upon corporate profits. Herbert's witnesses placed a value of $165,235 on the company's machinery and equipment; $40,000 to $45,000 on the land; and $173,500 to $209,500 on the buildings, docks, ship ways and sidetrack.

The corporate books show that, on December 29, 1941, Herbert was paid a bonus of $1,800, and Arthur was paid a bonus of $10,200. Herbert testified that he first learned of this recorded bonus payment when his accountant examined the books in March, 1951. He further testified that not only had he not been consulted about the payment of such a bonus, but that he had not received the $1,800 bonus charged to him.

All of the assignments of error are directed to the making of, or refusal to make, certain findings of fact.

When an action is dismissed at the conclusion of plaintiff's case, no findings of fact are required. *Wise v. Vaughan*, 160 Wash. 505, 295 Pac. 126. See, also, *Bowman v. Webster*, 42 Wn. (2d) 129, 253 P. (2d) 934. We will therefore regard the assignments as presenting the general question of what the facts are with reference to the matters and things placed in issue by the pleadings, and whether such facts established a *prima facie* case with regard to any of the requested items of relief. See *Group Health Coopera-*

*tive of Puget Sound v. King County Medical Society,* 39 Wn. (2d) 586, 237 P. (2d) 737.

The evidence which has been reviewed above is not in dispute, as the only persons to testify were appellant and four witnesses whom he called. It is accordingly our view that, for the purposes of this appeal, the facts are as set out in the foregoing summary of the evidence.

We turn, then, to the question of whether, on these facts, appellant has established a *prima facie* case with regard to any of the requested items of relief.

Appellant seeks a decree establishing his claim to a one-half interest in the company. It is his contention that Arthur holds as trustee for Herbert ten of the 249 shares purchased from the stepdaughters. These ten shares, if subtracted from Arthur's present 260 shares and added to Herbert's 240, would give the brothers equal ownership in the corporation. It appears to be appellant's position that Arthur is a trustee either by virtue of an express trust created under Mrs. Johnson's will, wherein he was given a veto power over Herbert's right to sell his 125½ shares of bequeathed stock, or by reason of a resulting or constructive trust.

Mrs. Johnson's will dealt only with the 251 shares which she owned. Therefore, it could not be said that the will established an express trust as to any of the other 249 shares which the brothers later purchased from the stepdaughters.

A resulting trust may be declared under a variety of circumstances, the most common of which pertains to the purchase of property. When title to property is taken in the name of a grantee other than the person advancing the consideration, the one in whose name title is taken is a resulting trustee for the person who paid the purchase price, in the absence of evidence of a contrary intent. *Donaldson v. Greenwood,* 40 Wn. (2d) 238, 242 P. (2d) 1038. While this principle is more often applied in the case of transactions involving real property, it likewise applies in the case of personal property transactions. See *Makinen v. George,* 19 Wn. (2d) 340, 142 P. (2d) 910.

■ The evidence before us at this stage of the proceedings establishes that Herbert and Arthur made equal contributions to the purchase price for the 249 shares. It also establishes that Arthur was permitted to receive and hold ten of Herbert's half of the purchased shares, not as a gift, but for the sole purpose of giving Arthur managerial control of the company. Therefore, applying the principle referred to above, appellant made a *prima facie* showing that Arthur holds these ten shares as trustee for Herbert under a resulting trust.

Respondent contends, however, that the statute of limitations precludes appellant from now obtaining judicial recognition of this resulting trust.

■ Statutes of limitation apply to actions in equity as well as actions at law, except that as between the trustee and the beneficiary of an express trust, the statute does not run so long as the trust subsists. *Hotchkin v. McNaught-Collins Imp. Co.*, 102 Wash. 161, 172 Pac. 864. Respondent does not indicate the particular statutory provision upon which he relies. We believe that the applicable statute is RCW 4.16.080(3) [*cf.* Rem. Rev. Stat. (Sup.), § 159(3)], setting up a three-year limitation for an action upon a contract or liability, express or implied, which is not in writing, and does not arise out of any written instrument.

■ Arthur acquired record title to the ten shares in question late in 1941 or early in 1942. This action was begun on July 5, 1951. But the statute of limitations begins to run on a resulting trust, not when such trust comes into being, but when the trustee repudiates the trust and notice of such repudiation is brought home to the beneficiary. *Arnold v. Loomis*, 170 Cal. 95, 148 Pac. 518; Bogert on Trusts and Trustees, 541, § 466.

■ In so far as the evidence before us indicates, the first time respondent repudiated this resulting trust, and the first time appellant had notice of such repudiation, was when respondent filed his answer herein on August 2, 1951, or at the earliest, when Herbert was discharged, on January 4, 1951. We therefore conclude that the statute of limitations does not bar appellant from seeking, in this action, a

decree, based on resulting trust, establishing his claim to a one-half interest in the company.

In view of this conclusion, it is not necessary to now determine whether, under these facts, it could also be said that a constructive trust came into existence as to the ten disputed shares.

We will next consider appellant's prayer for a decree adjudging the corporation to be the owner of certain real property now held by Arthur, and for a decree requiring Arthur to refund to the corporation certain moneys alleged to have been illegally withheld. The real property in question is that which the company formerly leased from King county, but which Arthur later purchased from the county and leased to the corporation. The moneys alleged to have been illegally withheld consist of two items: asserted excess rentals paid to Arthur by the corporation, and an asserted wrongfully-declared bonus.

Appellant does not complain because Arthur purchased the tract in question. This was done openly, and Herbert consented thereto, believing that it was for the benefit of the corporation. Herbert also knew that Arthur was collecting five hundred dollars a month rental from the corporation, as compared to the forty-five dollars a month rental the company formerly paid to King county. Herbert did not object to the five-hundred-dollar monthly rental. The evidence indicates that, in consenting to the purchase and failing to object to the rental arrangement, Herbert understood that Arthur would convey the tract to the corporation as soon as Arthur had been reimbursed through payment of rentals. That the understanding was mutual is indicated by Herbert's statement that Arthur, when approached on the matter, said, "One of these days I'll fix it."

Arthur acquired the tract in November, 1943, and has been collecting five hundred dollars a month rent from the corporation ever since. The trial was held in March, 1952, so that, up to then, Arthur had collected rent aggregating $50,500. The purchase price was $9,500, plus an undisclosed commission. Respondent also had taxes to pay, and apparently gave the corporation the use, without addi-

tional rental, of an adjoining tract which he acquired without Herbert's knowledge. But, since the aggregate rental received was more than five times as great as the purchase price of the first tract, there can be no doubt that Arthur was, prior to the trial, fully reimbursed for such purchase price after payment of any reasonable commission and taxes, and allowing credit for reasonable interest for the use of his money.

At the time of the original purchase and at all times since, Arthur was a director and officer of the corporation. As such he acted in a fiduciary capacity, and was bound to exercise the utmost good faith in conserving and furthering the interests of the corporation. RCW 23.36.080 [cf. Rem. Rev. Stat. (Sup.), § 3803-33]; *Central Bldg. Co. v. Keystone Shares Corporation*, 185 Wash. 645, 56 P. (2d) 697; *Larson v. A. W. Larson Constr. Co.*, 36 Wn. (2d) 271, 217 P. (2d) 789.

It would also appear that Arthur occupied the position of a fiduciary with regard to his brother's corporate interests, in view of the relationship of trust and confidence between them; Herbert's dependence upon his more experienced older brother; and their majority-minority stock ownership relationship. This fiduciary relationship was further strengthened by the leverage which Mrs. Johnson's will gave to Arthur in dealing with Herbert. As noted above, the will provides that Herbert cannot sell the shares which had been bequeathed to him without his brother's consent.

Those who serve in a fiduciary capacity as stockholder or director of a corporation may not personally profit at the expense of the corporation. *Morrison v. Nelson*, 38 Wn. (2d) 649, 231 P. (2d) 335. One who stands in a personal fiduciary relationship to another is similarly under a duty not to profit at the expense of the other.

Under the evidence reviewed above, Arthur has violated that duty by retaining possession of the real property which the corporation formerly leased from the county, after being fully compensated for expenses incurred in its acquisition. This establishes, *prima facie*, that, upon failing

to convey the property to the corporation after receiving such reimbursement, Arthur became trustee of the property for the corporation under a constructive trust. The applicable principle is stated in *Raymond v. MacFadden,* 21 Wn. (2d) 328, 344, 150 P. (2d) 829, where we quoted with approval the following definition of a constructive trust, as stated by Judge Cardozo:

" 'A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.' [*Beatty v. Guggenheim Exploration Co.,* 225 N. Y. 380, 386, 122 N. E. 378, 380.]" (p. 344)

Again, respondent argues that the statute of limitations bars a cause of action on this theory.

■■ Arthur acquired the tract in November, 1943. However, the constructive trust did not come into existence until Arthur received full compensation for the purchase price and other expenses. The action was begun on July 5, 1951.

We think that the three-year statute of limitations pertaining to actions for relief upon the ground of fraud (RCW 4.16.080(4), Rem. Rev. Stat. (Sup.), § 159(4)) applies under the facts of this case. This statute would not begin to run until Herbert discovered, or should have discovered, that Arthur had received full compensation and was therefore fraudulently withholding the property. *Ackerson v. Elliott,* 97 Wash. 31, 165 Pac. 899.

The fact is that Herbert never did discover when Arthur received full compensation. Nor did he have any way of ascertaining that fact, for it would have required an examination of Arthur's books.

Moreover, there is considerable authority to support the view that, for another reason, the statute of limitations did not begin to run as to this cause of action. See Bogert on Trusts and Trustees, 219, § 953, citing numerous cases, for the proposition that if, after a wrongful withholding of property, the holder recognizes the equity of the wronged

person and in substance asserts that he holds legal title in trust for the injured person, the statute of limitations does not operate against the beneficiary. Here, Arthur did recognize his duty when approached by Herbert, and told Herbert that he (Arthur) would convey the land to the corporation "one of these days."

We therefore conclude that the cause of action based upon a constructive trust with regard to the tract in question is not barred by the statute of limitations.

If this constructive trust is ultimately established on the basis of all the evidence, it will, to a considerable extent, account for the excess rentals Arthur has received over the years. If there then remains additional excess rentals, the same facts which give rise to a constructive trust regarding the real property will, on the theory of money had and received, entitle the corporation to recovery thereof. See *Tefft v. Schaefer*, 148 Wash. 602, 269 Pac. 1048. We now speak only on the basis of the *prima facie* case which appellant has presented, and which may be overcome when respondent produces his own evidence.

What has just been said regarding the corporation's right, on this record, to recover excess rentals, is also applicable to the asserted wrongfully-declared bonus of $10,200 which Arthur received. Since Arthur stands in a fiduciary relationship to the corporation and the minority stockholder, the burden is upon him to establish that this was a proper disposition of corporate surplus.

Herbert did not discover this bonus transaction until his own accountant examined the books shortly before this action was brought. In view of his lack of education, experience and knowledge of business affairs, he is not chargeable with earlier knowledge, though such information might have been ascertained by an examination of the books. *Wallace v. Lincoln Sav. Bank*, 89 Tenn. 630, 15 S. W. 448. It is not even established, on this record, that Herbert had actual access to the books in which such bonus was recorded, though as a director he was entitled to examine

the same. These considerations lead us to believe that the statute of limitations has not run as to this bonus transaction.

In our view, appellant has not established a *prima facie* case with regard to the alleged wrongful withholding of salaries. The reason given for the salary reductions of which he complains was that company business required this action. The record does not establish otherwise, nor is there any basis for concluding that appellant's services were worth more than he was actually paid.

Whether or not appellant's request for an accounting, appraisal and sale of corporate assets has merit, depends upon whether he ultimately prevails on any of the matters concerning which he has established a *prima facie* case. If he does, then it will be for the trial court to determine what equitable procedures should be followed to assure a fair and proper determination and enforcement of his rights.

The judgment is reversed and the cause is remanded, with directions to grant appellant a new trial.

GRADY, C. J., SCHWELLENBACH, DONWORTH, and FINLEY, JJ., concur.