IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MELODY L. PETLIG, an individual, | No. 84007-0-I |
| Appellant/Cross-Respondent, | DIVISION ONE |
| v. | |
| THE ESTATE OF GARY WEBB, by and through its Administrator, Jessica Webb; and JESSICA WEBB, individually and in her marital community interest, | UNPUBLISHED OPINION |
| Respondents/Cross-Appellants. | |

SMITH, C.J. — Gary Webb and Melody Petlig lived together on a property Gary owned. Though not married, they held themselves out as a couple. They had a daughter, Jessica, who lived with them. In 2017, Gary quitclaimed the property to Jessica, intending that Melody would be able to live on the property until her death. Gary died in 2018. A year later, Jessica evicted Melody. Melody sued. The trial court awarded Melody $34,067.00 in damages based on an equitable committed intimate relationship (CIR) theory and taking into account Melody's contributions to the property over the years. But though it found that Gary intended Melody to have an ongoing interest in the property, it concluded that in the face of the property's transfer via quit claim deed, it did not have the legal power to recognize that interest through the recognition of a constructive trust. Melody and Jessica cross-appeal.

We reverse the trial court concerning both its award of equitable damages and its conclusion that Melody had no interest in the property recognizable through a constructive trust. CIR claims allow committed partners to equitably challenge estate distribution decisions within three years of their loved one's death, but the property was not a part of Gary's estate at his death, and was transferred to Jessica more than three years before this lawsuit was filed. However, the equitable power to recognize a constructive trust exists to acknowledge property interests even where formal ownership would preclude that recognition. As a result, the mere existence of a quit claim deed is not dispositive.

## FACTS[1]

Melody Petlig and Gary Webb began seeing each other in the early 1980s and though they never married, were in a committed intimate relationship (CIR) when Gary[2] passed away in 2018. For the duration of their relationship, they lived on a property in Auburn, Washington, first in a mobile home and later in the house located on that property. For most of this time, the property was owned by Jessie Webb, Gary's father, and he allowed the couple to live on it rent-free, then Gary inherited it after Jessie's death in 2011. After Gary and Melody's daughter, Jessica, was born in 1989, the three lived together as a family unit. Jessica had

---

[1] These facts are drawn from the trial court's unchallenged findings of fact unless otherwise stated.

[2] Because many of the individuals in this case share the same last name, we refer to them by their first names to provide clarity.

a son around 2011,[3] who grew up on the property alongside his mother and grandparents.

Though they were never married, Gary and Melody presented themselves to the community as, for all practical purposes, husband and wife. Testimony in the eventual trial in this case from a longtime family friend, Anthony Ferrari, described them as "inseparable." They lived together, raised Jessica together, sometimes shared a joint checking account, and generally pooled their resources. When Gary assigned Melody power of attorney on his behalf, he wrote that "Melody and I have lived together, practically as man and wife, for over 30 years."

Because Melody was the main earner in the relationship—Gary did not have a stable source of income until 2010, when Melody helped him obtain social security disability benefits, nor was Jessica employed through at least 2018—her income provided for most of the family's basic needs. Over the years, Melody not only served as the breadwinner but sold her own property—a Ford Explorer—to pay real estate taxes on the property. Through one means or another, Melody paid property taxes on the property from June 2011, after Jessie's death, until September 2019. She also paid for the majority of costs associated with structural maintenance on and improvements to the house, automobiles, utilities, farm equipment, and Gary's medical expenses and, eventually, funeral expenses. Jessica testified at odds with these findings by the

---

[3] Jessica's son was ten years old at the time of trial in 2021.

trial court, and the court expressly found Jessica not credible "as to the nature of her parents' relationship [and] the history of the family's finances."

Gary's health worsened as the years passed. By 2015 he was "fully incapacitated" and in 2017 he became completely disabled; Melody stopped working to become his full-time caregiver. After spending some time in a rehabilitation center, Gary resided in the house on the property, where Melody and Jessica cared for him together. He died on March 7, 2018. His death certificate names Melody as his partner.

In January 2017, before Gary died, he had transferred his ownership in the property to Jessica via a quit claim deed executed by Melody, who held his power of attorney. The nuances of his intent in effecting this transfer were the subject of the trial in this case, but no party contests that one of the purposes of the quitclaim was to avoid his and Melody's creditors' ability to get at the property.

Aside from protecting the property from creditors, testimony at trial tended to show that Gary intended that Melody and Jessica would live in the house until their deaths and, indeed, that Melody had some degree of stake in the property even before then, at least in Gary's eyes. Ferrari testified that Gary's lasting hope, and a motivating thought as he had attempted to improve the property, had been that he would leave it to "his girls." Melody testified that Gary had striven to ensure that she would have "a place to stay forever," and promised her the same many times. And a 2012 rental agreement signed by both Gary and Melody to

rent out their mobile home identified them both as the Auburn property's "owners." Melody, not Jessica, collected this rental income after Gary's death.

Melody and Jessica's relationship soured, however. In September 2019, Jessica forcibly evicted her mother from the property. In the time between her eviction and trial in this case, Melody lived a transient lifestyle and experienced homelessness.

Despite these troubles, Melody managed to find an attorney and initiate this lawsuit against Jessica, whom she sued both in her individual capacity and as the executor of Gary's estate. Melody's central goal, as expressed in the various claims she made in her complaint, was to gain recognition of her right to reside in the property, or at least receive equivalent compensation. As articulated at various points, her aim was for the court to recognize a "life estate" in the property.[4]

The matter went to a bench trial. The trial court made a number of findings, and concluded first that Gary and Melody had a CIR, then that Melody had no right to live in the property, and finally that Jessica had unjustly benefitted from the improvements Melody made to the property. The court awarded Melody $34,067.00 in damages.

Both parties appeal.

---

[4] A "life estate" is a right to the use and enjoyment of a property, typically to the same extent as an owner in fee simple, save that title of the property is held by a "remainderman," to whom all uses of the property will revert on the death of the one who holds the life estate. Estate of Irwin, 10 Wn. App. 2d 924, 928, 450 P.3d 663 (2019).

ANALYSIS

We are presented with challenges to the trial court's two main rulings: its decision to award Melody damages for her contributions to the property over the years, and its decision to deny her a life estate in the property by way of the creation of a constructive trust. Jessica challenges the first decision; Melody the second. We reverse both, in the process rejecting Jessica's contentions that Melody failed to preserve the argument she now makes on appeal and that Melody's claim is barred by the statute of limitations.

Committed Intimate Relationship Reimbursement

We begin by addressing the trial court's award of reimbursement to Melody for the contributions she made to the property over the years. The trial court awarded Melody $34,367 for these contributions to the community based on her CIR with Gary. Jessica challenges the reimbursement on several grounds, including by contending that no CIR claim could be brought against Gary's estate or Jessica individually and that the statute of limitations on any CIR claim had run by the time this lawsuit was filed. We agree with Jessica that this award is blocked by the relevant statute of limitations.

"The CIR doctrine is a judicially created doctrine used to resolve the property distribution issues that arise when unmarried people separate after living in a marital-like relationship and acquiring what would have been community property had they been married." Matter of Kelly, 170 Wn. App. 722, 731, 287 P.3d 12 (2012). When a CIR ends, the former partners may petition the court for a " 'just and equitable disposition of the property,' " a process analogous

6

to dissolution.[5]  Connell v. Francisco, 127 Wn.2d 339, 347, 898 P.2d 831 (1995)

(quoting Latham v. Hennessey, 87 Wn.2d 550, 554, 554 P.2d 1057 (1976)).

Similarly, if one partner dies, the other may sue the decedent's estate, ask the

court to recognize a CIR, and seek equitable property distribution of whatever the

decedent owned.  Vasquez v. Hawthorne, 145 Wn.2d 103, 107-08, 33 P.3d 735

(2001).  As an equitable cause of action, any claim to property made under a CIR

theory must be brought within three years of the time the claim becomes ripe.

Kelly, 170 Wn. App. at 735 (citing RCW 4.16.060(3)).

The trial court in this case relied on a CIR theory to award damages to

Melody.  Citing relevant case law, it concluded that though Melody had no

equitable right in ownership of the property itself, she had a "right of

reimbursement" for the improvements she had made to the house over the years

and property taxes she had paid.

But Gary transferred ownership of the property to Jessica on January 25,

2017.  It was not a part of his estate at the time of his death in 2018, and

therefore could not have been subject to probate or distributed based on a CIR

---

[5] Determination of whether a CIR existed is a fact-intensive process that looks at five factors: (1) whether cohabitation was continuous; (2) the relationship's duration; (3) the relationship's purpose; (4) whether resources were pooled; and (5) the parties' intent.  Connell v. Francisco, 127 Wn.2d 339, 346, 898 P.2d 831 (1995).  The court applied this analysis to Melody and Gary's relationship and concluded it was a CIR.  Neither side challenges this conclusion or its underlying findings.

Until fairly recently, case law referred to CIRs as "meretricious" relationships.  E.g., Connell, 127 Wn.2d at 346.  "Meretricious" derives from the Latin *meretrix*, meaning prostitute.  Peffley-Warner v. Bowen, 113 Wn.2d 243, 246 n. 5, 778 P.2d 1022 (1989).  Because of the term's derogatory connotations, "CIR" is now the preferred terminology.  Olver v. Fowler, 161 Wn.2d 655, 657, 168 P.3d 348 (2007).

theory. Even assuming for the purposes of argument that Melody had, by virtue of a CIR, some right to challenge the property's transfer and sue Jessica personally, that claim should still have brought within three years of the transfer itself. But this lawsuit was initiated in September 2020, more than three years after Melody executed the quitclaim deed and beyond the statute of limitations that governs CIR claims.

Because no application of the CIR doctrine can support the trial court's reimbursement award, we reverse it.

<u>Creation of a Life Estate</u>

Melody contends that the trial court erred by not recognizing that she is the beneficiary of a constructive trust granting her a life estate in the contested property. We agree and reverse because the trial court found that it was the various parties' intent to create a life estate and, contrary to the trial court's legal reasoning, this intent is not made irrelevant by the formal transfer of the property through a quit claim deed.[6]

---

[6] Jessica asserts that Melody "never argued entitlement to a life estate over her partner's separate property" at the trial court and so waived her ability to argue it on appeal, correctly pointing out that "[f]ailure to raise an issue before the trial court generally precludes a party from raising it on appeal." <u>New Meadows Holding Co. v. Wash. Water Power Co.</u>, 102 Wn.2d 495, 498, 687 P.2d 212 (1984).

Jessica is wrong. In her complaint, one of Melody's pleaded causes of action was that she benefited from the creation of a constructive trust granting her an interest in the property. In pre-trial briefing, Melody wrote: "the family agreement was quite simple: the family home is put in Jessica's name, to avoid creditors or impact on public benefits, but Melody gets a life estate (continue to life in the home until she dies)." In pre-trial discussions, Melody's attorney said: "even if it's separate property, it does not do anything to limit Melody's claim as to her interest regarding use of the property as a potential life estate." And during closing argument, Melody's argument articulated the claim once again, asserting

1. Existence of a Constructive Trust

A constructive trust is an equitable remedy allowing courts to transfer property interests. In the Matter of Gilbert Miller Testamentary Credit Shelter Tr., 13 Wn. App. 2d 99, 106, 462 P.3d 878 (2020). It is " 'the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.' " Arneman v. Arneman, 43 Wn.2d 787, 800, 264 P.2d 256 (1953) (quoting Beatty v. Guggenheim Expl. Co., 225 N.Y. 380, 386, 122 N.E. 378 (1919)). Though often applied in instances in which property was acquired through fraud or misconduct, "[a] constructive trust may arise even though acquisition of the property was not wrongful. It arises where the retention of the property would result in the unjust enrichment of the person retaining it." Scymanski v. Dufault, 80 Wn.2d 77, 89, 491 P.2d 1050 (1971).

Unjust enrichment exists when three elements are present: "(1) the defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment." Young v. Young, 164 Wn.2d 477, 484, 191 P.3d 1258 (2008). The circumstance-dependent nature of the third element of unjust enrichment

---

Melody benefited "by way of the oral contract to be enforced through the Court's equitable powers via a constructive trust and for purposes of avoiding unjust enrichment."

Melody consistently presented a theory of her case, from the lawsuit's start to its end, contending that she benefitted from a constructive trust that had created for her a life estate in the property. Jessica's arguments to the contrary are groundless.

9

means that the context of the ownership of a property interest heavily impacts a court's determination of whether to impose a constructive trust. For instance, "courts have imposed constructive trusts when the evidence established the decedent's intent that the legal title holder was not the intended beneficiary." Baker v. Leonard, 120 Wn.2d 538, 548, 843 P.2d 1050 (1993).

A court sitting in equity may impose a constructive trust based on clear, cogent, and convincing evidence when the basis for the trust's imposition is fraud. Yates v. Taylor, 58 Wn. App. 187, 191, 791 P.2d 924 (1990). But where there is no evidence of fraud and a constructive trust is imposed through a quasi-contract theory such as unjust enrichment—the theory at issue here—only a preponderance of the evidence need be shown. Yates, 58 Wn. App. at 192. On review, the appellate court upholds the trial court's findings if substantial evidence supports them. In the Matter of Estate of Krappes, 121 Wn. App. 653, 665, 91 P.3d 96 (2004). If the findings are supported, whether a constructive trust exists is a question of law reviewed de novo. See In re Marriage of Lutz, 74 Wn. App. 356, 372, 873 P.2d 566 (1994) (treating existence of a constructive trust as a matter of law reviewed de novo).

A case analogous to this appeal and relied on heavily by Melody illustrates the creation of a constructive trust in practice: Mehelich v. Mehelich, 7 Wn. App. 545, 551, 500 P.2d 779 (1972). Joseph and Helen Mehelich purchased a house intending "to provide [Joseph's] parents with a place to live the rest of their lives, after which the property would belong to" Joseph and Helen. Mehelich, 7 Wn. App. at 548. After the purchase, the parents lived in the property, made

substantial improvements, paid real estate taxes and insurance, and did not pay and were not asked to pay rent to Joseph. Mehelich, 7 Wn. App. at 551. No contract governed the implicit terms of the family members' agreement. Mehelich, 7 Wn. App. at 551. Instead, the parents trusted their son to handle the matter in accordance with their shared understanding of the arrangement. Mehelich, 7 Wn. App. at 551. Given those facts, this court concluded that "to hold otherwise than [that a constructive trust ought to be imposed to the extent of a life estate in the father] would be to allow the unjust enrichment of [Joseph and Helen] at the expense of [Joseph's father]." Mehelich, 7 Wn. App. at 551.

The facts of this case are on all fours with those of Mehelich, and the trial court's unchallenged findings[7] support the imposition of a constructive trust granting Melody a life estate in the property as a matter of law. The transfer of title of the property from Gary to Jessica via quitclaim deed easily satisfies the first element of unjust enrichment: the defendant receiving a benefit. Equally easily satisfied is the second element—that the benefit came at the plaintiff's expense—since the findings indicate that Melody had for years borne the brunt of

---

[7] Unchallenged findings are verities on appeal. Robel v. Roundup Corp., 148 Wn.2d 35, 42, 59 P.3d 611 (2002). A conclusion of law erroneously denominated a finding of fact will nonetheless be reviewed de novo. Robel, 148 Wn.2d at 43. Jessica nominally challenges the "Corrected Findings of Fact and Conclusions of Error" as a whole. But to be effective, challenges to findings of fact must be made by reference to the specific number of the finding, and with a different assignment of error for each finding contested. RAP 10.3(g). Jessica has not done so, nor does she argue about the sufficiency of the evidence supporting various findings in her briefing, nor does she, in her reply brief, contest Melody's contention that she has failed to make a proper challenge to individual findings. We therefore treat the trial court's findings of fact as verities.

11

the burden of the property's ownership and upkeep and also indicate that she continued to after the transfer.

The third element—whether circumstances make it unjust for the defendant to retain the benefit without payment—requires a more detailed analysis of the trial court's ruling. As established by Baker and Mehelich, this element depends in part on the intent of the transferor of the property and the shared understandings of others involved in that transfer. Most relevant to our analysis is the trial court's Conclusion of Law 3, which, despite its title, consists mainly of factual findings:

> As previously discussed, it undisputed using her authority as Gary's Attorney-in-fact, Melody executed a Quit Claim Deed transferring the Auburn Property solely to Jessica on January 25, 2017. The court has considered but is not persuaded by Melody's argument the Gary intended to create an oral agreement which should override the written Quit Claim Deed. This is not to say the court finds Melody' s testimony lacks credibility, it does not. However, the court is not persuaded that legally under the circumstances of this case, the intent behind the written document can be overridden by the implied intention of Gary: meaning he intended for Melody to live on the Auburn Property as a life estate. Gary' s clear intention for the execution of the Quit Claim Deed, which unconditionally assigns all property rights to Jessica, was to avoid his and Melody's creditors. This assertion is uncontested.

Though not included as a separate finding, the trial court found that Gary's intent at the time he transferred the property to Jessica was for Melody to continue living there, essentially holding a life estate. Supporting this understanding of the trial court's finding is its much clearer finding that Melody's testimony about Gary's intent was credible. However, despite its finding, the trial court did not impose a constructive trust because it did not believe that Gary's

12

intent to create a life estate could "legally" coexist with his parallel intent to avoid Melody's creditors.

We disagree. In the first place, these intents are not—as Jessica contends and as the trial court apparently believed—truly at odds. Jessica asserts that life estates may be subject to levy by creditors, and thus that any intent to create a life estate would be logically inconsistent with a transfer to avoid liability to creditors. But this confuses the intent behind actions with their legal impact. Secondly, this argument assumes that the "unconditional[] assign[ment]" of property rights to Jessica cannot coexist with an intent to create a life estate. This conclusion appears to rely on the unqualified text of the quitclaim deed itself, but that text has only minimal bearing on whether a constructive trust exists. Constructive trusts, by their nature, exist at odds with written indications of property ownership. The doctrine would otherwise serve no purpose.

We therefore rely on the trial court's finding that Gary intended to create a life estate to conclude that Jessica would be unjustly enriched if no constructive trust were recognized. As in Mehelich, Jessica's possession of title in the property came into existence alongside Melody's possession of a life estate. That this understanding was shared among the various parties is reflected in Melody's continued custodianship of the property—collecting rents and paying taxes—as well as Jessica's tacit allowance of the same activities. And there is no indication that Jessica ever attempted to charge Melody or Gary rent on

13

receiving ownership of the property.[8]  Given that the facts are unchallenged and the trial court's hesitation was legal in nature, we conclude that the court erred as a matter of law.

> 2.  <u>Statute of Limitations</u>

Finally, Jessica contests that even if it may have merit, Melody's constructive trust claim is barred by the relevant statute of limitations.  We disagree.

Which statute of limitations governs a constructive trust claim depends on the substantive claim underlying the action.  <u>Gilbert Miller</u>, 13 Wn. App. 2d at 107.  "The statute of limitations applicable to a common law cause of action for unjust enrichment is three years under RCW 4.16.080(3)."  <u>Gilbert Miller</u>, 13 Wn. App. 2d at 108.  "For a constructive trust the statute of limitations begins to run when the beneficiary discovers or should have discovered the wrongful act which gave rise to the constructive trust."  <u>Dep't of Revenue v. Puget Sound Power & Light Co.</u>, 103 Wn.2d 501, 509, 694 P.2d 7 (1985).

Here, the wrongful act giving rise to the constructive trust was Jessica's eviction of Melody.  The statute of limitations on Melody's constructive trust claim therefore began running at that time.  The eviction occurred in September 2019.  This lawsuit was initiated in September 2020.  The lawsuit consequently falls within the three-year period prescribed by the statute of limitations.

---

[8] Melody's opening brief and reply/response brief make this claim more directly, asserting that Jessica did not charge rent, but it does not appear to be stated so explicitly anywhere in the record.  Conversely, no evidence exists that Jessica *did* seek to charge Melody or Gary rent, and Jessica's briefing never rebuts the claim.

## DISPOSITION

We reverse and remand for entry of new conclusions of law consistent with this opinion and for the trial court's determination of the appropriate remedy to enforce Melody's life estate in the property.

We take a moment to clarify the disposition of the mobile home located on the property. What is denominated the trial court's fourth conclusion of law indicates that "the entire family considered the mobile home unit as part of the Auburn Property." We treat this as a factual conclusion. In light of Gary's intent to award Melody a life estate in the property as a whole, we conclude that her corresponding property interest encompasses the mobile home.

We note that our reversal does not impact the court's eighth conclusion of law, awarding Melody ownership of a collection of personal property under a CIR theory. Nor does it impact the court's division, in the same conclusion, of certain community property—a tractor and car—acquired during the relationship, which the trial court ordered sold and the proceeds split between the parties. The parties did not assign error to these decisions.

Reversed and remanded.

_____
Smith, C.J.

WE CONCUR:

_____
Díaz, J.

_____
Mann, J.

15