[No. 44956.   En Banc.   February 23, 1978.]

WASHINGTON ASSOCIATION OF COUNTY OFFICIALS, ET AL, *Petitioners*, v. WASHINGTON PUBLIC EMPLOYEES' RETIREMENT SYSTEM BOARD, ET AL, *Respondents*.

E. R. Whitmore, pro se, *Kane, Vandeberg & Hartinger,* by *Elvin J. Vandeberg* and *Darrel B. Addington,* for petitioners.

*Slade Gorton, Attorney General,* and *Wayne L. Williams, Assistant,* for respondents.

DOLLIVER, J.—This is an original action before this court seeking a writ of mandamus and declaratory judgment relief. It challenges both the statutory and constitutional validity of the inclusion of "termination payments" by the Washington Public Employees' Retirement System (PERS) in computing the pension benefits due its retiring members.

The Public Employees' Retirement System disburses lifetime monthly pension payments to its retired members. The amount of payment is computed upon a prescribed percentage of the employee's "average final compensation" which is defined in RCW 41.40.010(15) as "the annual average of the greatest compensation earnable by a member

during any consecutive two year period of service for which service credit is allowed". The pension benefit is normally equal to 2 percent of that average for each year of service, up to a maximum of 60 percent.

Each employee contributes 6 percent of his monthly salary to the retirement system. The employer contribution is set on an actuarial basis at a rate which, together with the employee contribution, funds the expected cost of system benefits.

RCW 41.40.195 provides for a cost–of–living increase in pension payments if the cost of such increase has been met by the excess of the growth in assets of the system over that required for meeting the actuarial liabilities of the system. This increase has been granted each year since its statutory authorization.

In the month of retirement, a substantial number, but not all, employers in PERS pay to their retiring employees certain termination payments. These payments may include accumulated and unused sick and vacation leave as well as severance pay and vary employer by employer with some employers paying all of the above items. These payments are currently included in computing the total compensation earned by an employee in his 2 most highly compensated years of employment if his last 2 years are used as the base period. Since in most cases the 2 final years of employment are the highest paid consecutive 2 years, the termination payments become a part of the "average final compensation" upon which the pension benefits are computed.

The impact of including termination payments when computing the "average final compensation" is not insignificant, amounting to an annual cost of between $5 and $6 million. In 1975, the total employee and employer rate of contributions was 13 percent of all compensation. If PERS had not included termination payments in computing benefits, the rate would have been 12.4 percent of all compensation.

The practice of PERS has been consistent. Since 1952 when a municipal corporation first made termination payments available to its employees, PERS has included such payments in its computation of "average final compensation." This practice was known to and approved by the PERS director at least as early as 1960, although the minutes of the meetings of the board of directors indicate that the first time the matter was discussed in a board meeting was October 21, 1974. No formal regulation or ruling has been promulgated by the board in regard to treatment of termination payments.

In interpreting whether the definition of "average final compensation" in RCW 41.40.010(15) includes termination payments made to some members of PERS, we first consider petitioners' argument that the definition of "final compensation" in RCW 41.40.010(16) is controlling. The complete definition of the term "average final compensation" is contained in RCW 41.40.010(15). There is no need for the term to be broken down and its constituent parts defined elsewhere. "Final compensation" is a different term which has no relationship to RCW 41.40.010(15), nor any relevance in determining the meaning of "average final compensation" or in setting pension benefits.

■■ We next look to legislative intent. That intent is best expressed by the recent actions of the 1977 legislature in regard to the pension statutes.

The problem of inclusion of termination benefits was considered in revisions made to RCW 41.40. As to members entering PERS on or before September 30, 1977, the law was left unchanged, but for those employees entering PERS on or after October 1, 1977, termination payments are now specifically excluded. *See* RCW 41.40.010(8)(b); Laws of 1977, 1st Ex. Sess., ch. 295, § 16, pp. 1091, 1092. The legislature had specific knowledge of the practice of including termination payments when they made the recent changes. Attorney General Opinion, January 12, 1976. If they had intended to revise the current practice as to existing employees they would have expressly stated that desire in

the form of a statutory amendment. We find no merit in petitioners' contention that "The legislature has left it to the judiciary to correct the respondents' erroneous interpretation of the prior statutory language."

■ In addition to what we believe is clear legislative intent to allow termination payments to be included in "average final compensation" prior to the effective date of Laws of 1977, 1st Ex. Sess., ch. 295, p. 1086, further grounds exist for our decision. For 25 years, PERS has consistently included termination payments in the computation of "average final compensation." During this period numerous expectations based upon this practice have arisen in the minds of current employee–members of the system. To now hold termination payments not includable would violate those expectations and be contrary to the position of this court first expressed in *Bakenhus v. Seattle*, 48 Wn.2d 695, 700, 296 P.2d 536 (1956), where we stated "The promise on which the employee relies is that which is made at the time he enters employment; and the obligation of the employer is based upon this promise."

*Hessel v. New York City Employees' Retirement Sys.*, 33 N.Y.2d 381, 308 N.E.2d 688, 353 N.Y.S.2d 169 (1974), relied on by petitioners is not controlling. There it was held that "compensation earnable" did not include lump–sum termination payments. That case was the opposite of this case inasmuch as the New York City Employees' Retirement System did *not* include such payments in its computations and a member was suing to force the system to institute such a practice. Furthermore, *Hessel* distinguished and did not overrule a factual situation in all relevant aspects identical to this case which had been discussed in *Kranker v. Levitt*, 30 N.Y.2d 574, 281 N.E.2d 840, 330 N.Y.S.2d 791 (1972). In *Kranker*, the same New York court held members of a retirement system which included termination payments in its pension base had vested rights in the continuance of that practice, and those rights could not constitutionally be impaired.

734

Petitioners remind us of our decision in *Ball v. Smith,* 87 Wn.2d 717, 556 P.2d 936 (1976), wherein we held weight need not be given to the interpretation of any agency employee not charged by statute with such authority or responsibility. However, here we are not relying upon the construction placed upon the statute by PERS in interpreting the statute. Rather, we hold that the practice of PERS has given rise to legitimate contractual expectations upon which the employees may rely and which PERS is bound to honor.

■ Plaintiffs next assert the inclusion of termination payments violates constitutional requirements of equal protection. U.S. Const. amend. 14; Const. art. 1, § 12. We do not agree. While it is true petitioners whose termination payments are not included in their average final compensation receive lesser pensions, the disparity in pensions is the result of varying levels of compensation set by different employers. The retirement statutes are neutral. Variations in compensation result from the salary ordinances of the various counties, not from the pension statutes. There is no classification by RCW 41.40 resulting in the alleged constitutional infirmity.

The petition is denied.

Rosellini, Hamilton, Stafford, Brachtenbach, and Horowitz, JJ., concur.

Hicks, J. (concurring in part; dissenting in part)—I have no quarrel with the majority in its determination that inclusion of termination payments in an employee's pension base does no violence to the equal protection clause. I do, however, differ with the majority in its conclusion that an employee's pension base may include payments other than those earned as salary or wages for personal services rendered during the 2–year measuring period. The majority's reliance on *Bakenhus v. Seattle,* 48 Wn.2d 695, 296 P.2d 536 (1956) to support its decision, I believe, is misplaced.

The term "average final compensation" on which the computation of monthly pension payments is based is defined in RCW 41.40.010(15) as:

the annual average of the greatest compensation *earnable* by a member during any consecutive two year period of service for which service credit is allowed . . .

(Italics mine.) The term "earnable" does not mean "receivable". It seems to me that by its use of the word "earnable", the legislature restricts the pension base to salary or wages earned in a particular 2–year period. Termination or other additional amounts received by the employee during that 2–year period cannot be said to have been "earnable" during that period. If earned at all, such payments should be extended over the entire period of employment.

It is to be noted that in 1949 the legislature changed the statutory definition in RCW 41.40.010(15) from "compensation received" to "compensation earnable." That change would seem to indicate an intent to include in the pension base only that amount earned by the employee during the measuring period. This, to me, is evident from the definition of "compensation earnable" as "salaries or wages earned during a payroll period for personal services". RCW 41.40.010(8). In my view, the plain words of the statute exclude termination or other additional payments from use in the computation of pension payments.

Nor do I agree that the expectations of affected public employees require the result reached by the majority. *Bakenhus v. Seattle, supra,* does not compel such a result. At the time the employee commenced work in *Bakenhus,* an existing statute provided for a pension of one–half the salary received in the year preceding retirement. A subsequent statutory change placed a $125 limit on pensions, which was about one–third less than Bakenhus would have received under the prior statute. The limiting statute provided no corresponding benefit for the reduction in pension, nor was it shown that the reduction was necessary to preserve the integrity of the pension plan. Consequently, the statutory reduction in *Bakenhus* was held to be invalid.

The present case is markedly different from *Bakenhus.* Employees, whose pension base included amounts other than their wages and salaries "earnable" during the selected measuring period, had no statute authorizing such practice when they were first employed, nor have they had one at any time since upon which to base any such expectations. In my view, the relevant existing statute clearly excludes the termination payments which the majority finds were expected by the employees to be included in their pension base.

We have said that we will give great weight to contemporaneous construction placed upon a statute by those whose duty it is to administer its terms. *Hama Hama Co. v. Shorelines Hearings Bd.,* 85 Wn.2d 441, 536 P.2d 157 (1975). In this case, the PERS Board of Directors is the entity charged with administering and managing the retirement system, which includes the statute herein concerned. That board made no construction of the statute to include termination or other payments in the pension base. The practice of such inclusion was initiated by an employee of PERS. Thus, any employee expectations which may have arisen over the years in this instance, followed from an unauthorized administrative practice of an employee of PERS, not from a statute or regularly adopted rule of the board of directors. No matter how one strains, such unauthorized practice cannot be brought within the rationale of *Bakenhus.*

The writ of mandate should be granted.

WRIGHT, C.J., and UTTER, J., concur with HICKS, J.