[No. 58159-2. En Banc. March 11, 1993.]

JOHN A. BOWLES, ET AL, *Respondents*, v. THE DEPARTMENT OF RETIREMENT SYSTEMS, ET AL, *Appellants*.

56

*Christine O. Gregoire, Attorney General, Maureen A. Hart, Division Chief,* and *Jean M. Wilkinson* and *Ann M. Cox, Assistants,* for appellants.

*Reed McClure,* by *William R. Hickman, Pamela A. Okano,* and *Stephen M. Todd,* for respondents.

JOHNSON, J. — Members of the Public Employees' Retirement System Plan I (PERS I) filed a class action suit against the Department of Retirement Systems contending the Department was improperly calculating retirement pensions. The plaintiffs argued the Department's calculations do not sufficiently take into account the compensation PERS I employees receive upon retirement in the form of lump sum payments of accrued vacation and sick leave benefits (hereafter referred to as "leave cashouts").

The trial court granted partial summary judgment in favor of each party. The trial court rejected the plaintiffs' argument that *all* leave cashouts are to be included in pension calculations, ruling that only leave accruing during the employee's relevant 2-year period of highest compensation may be included. The trial court, however, agreed with the plaintiffs that the Department violated their pension rights when it changed its practices and began reducing pension levels based on employers' limitations on leave cashouts. Under this ruling, members of the plaintiff class obtained a judgment with a present value of $18.8 million.

We affirm these rulings. We also address the trial court's rulings regarding attorney fees, interest, and the statute of limitations.

## I
### BACKGROUND

The PERS I pension plan covers employees who began working for the State or one of its political subdivisions prior to October 1, 1977. RCW 41.40.005(1); RCW 41.40.020. PERS I pensions are funded through contributions collected from both employees and employers. *See* RCW 41.40.330-.370. The Department administers the PERS I program. RCW 41.50-.030(1); RCW 41.40.020.

A PERS I member's pension is based on a percentage of the member's "average final compensation" (AFC). RCW 41.40-.185; RCW 41.40.190. AFC is defined by statute to mean "*the annual average of the greatest compensation earnable* by a member *during any consecutive two year period* of service for which service credit is allowed". (Italics ours.) Former RCW 41.40.010(15)(a). "Compensation earnable" in turn is defined as "*salaries or wages earned* during a payroll period *for personal services*". (Italics ours.) RCW 41.40.010(8)(a).

This court has already decided that leave cashouts in general meet these statutory definitions and accordingly must be taken into account in calculating pension levels. *See Washington Ass'n of Cy. Officials v. Washington Pub. Employees' Retirement Sys. Bd.,* 89 Wn.2d 729, 575 P.2d 230 (1978). In the current case we must decide *how* the cashouts are to be taken into account.[1]

Three PERS I members and beneficiaries sued the Department in February 1988, alleging in their complaint that leave cashouts in their entirety must be included in PERS I pension calculations, regardless of whether the leave being compensated accrued during the 2-year AFC period. The plain-

---

[1]An initial comment is necessary regarding the effect of *Washington Ass'n of Cy. Officials v. Washington Pub. Employees' Retirement Sys. Bd.,* 89 Wn.2d 729, 575 P.2d 230 (1978) on this case, as it can at least be argued that *County Officials* already answers the issue herein discussed. In the majority opinion of *County Officials,* this court rather broadly held that the Department's 25-year practice of including termination pay in pension calculations had created pension rights in favor of PERS I employees. The dissent interpreted the majority opinion to mean that *all* termination pay must be included, even with respect to leave accruing outside of the 2-year AFC period. *See County Officials,* 89 Wn.2d at 734 (Hicks, J., concurring in part, dissenting in part). The majority opinion did not expressly state this, however, and the agreed statement of facts in that case reveals that the Department's policy actually was only to consider the leave that accrued during the 2-year period. In the current case, the plaintiffs' appellate briefing acknowledges that the Department's historic policy was to only include leave from the 2-year period. For these reasons, we do not interpret *County Officials* as holding that the Department's historic practice included *all* termination pay in pension calculations. Accordingly, whether the Department should include all termination pay in calculating pensions remains an open issue for resolution in the current case.

tiffs' theory is that the termination pay is not "earned" until the date of termination, thus all the pay must be included in the 2-year period immediately preceding the termination date.[2] The Department instead limits inclusion of leave cashouts to leave that accrued during the AFC period.

The parties' arguments on this point are best illustrated through example. Assume a hypothetical employee has accrued 200 leave days over the course of his or her employment, with 24 of those days accruing during the employee's last 2 years of employment. Assume further that the last 2 years qualify as the employee's AFC period. The plaintiffs would require the Department to include all 200 days' pay in the AFC calculation, as it was *received* during the employee's AFC period. The Department's historical practice, however, has been to include only the 24 days of leave that *accrued* during the AFC period.

The plaintiffs' complaint contains a second set of allegations. It alleges the Department violated vested pension rights when it changed its practices in treating leave cashouts. This claim has evolved during the course of litigation. In its current form, the claim now focuses on how the Department treats the various limitations that employers place on leave cashouts. The plaintiffs contend that in the 1980's the Department first began taking into account the fact that some employers place *percentage* restrictions on leave cashouts, and that some employers place *fixed ceiling* restrictions on leave cashouts. Percentage limitations are created when an employer only cashes out a percentage of an employee's accrued leave. A fixed ceiling limitation occurs when an employer only cashes out leave accrued up to a specified number of days. These changes in practices can result in the Department not even including all the leave

---

[2] This theory assumes that the employee's AFC period is the last 2 years of his or her employment. For most employees this holds true, because an employee's last 2 years are usually the highest compensated. *See County Officials,* 89 Wn.2d at 731.

that accrued during the 2-year AFC period in calculating the AFC amount.[3]

The plaintiffs' complaint was framed as a class action, seeking declaratory relief that the Department erred in its calculations and injunctive relief requiring the Department to recalculate the pensions and pay the class members the additional amounts owed.

Judge Lloyd Bever of the King County Superior Court certified the suit as a class action under CR 23(b)(3). Judge Bever limited the class size due to a 3-year statute of limitations. He ruled that the statute began running on the date each employee terminated service. Because the suit was filed on February 3, 1988, Judge Bever limited the plaintiff class to currently employed PERS I members and those members who had retired or died after February 3, 1985, along with their spouses or surviving beneficiaries. Any PERS I member who retired or died on February 3, 1985, or earlier was excluded from the class.

The parties each moved for summary judgment. Judge Bever ruled partially in favor of each party. First, he ruled that the Department was correct in not including all termination pay when calculating AFC amounts; only the termination pay relating to leave that accrued during the employee's AFC period is properly included. Second, he ruled that the Department violated PERS I employees' pension rights when in the early 1980's the Department changed its practices and began taking into account employers' percentage and fixed ceiling limitations in calculating AFC amounts.

Judge Bever consequently ordered the Department to return to its previous practices and, upon receipt of a request for recalculation from a member of the plaintiff class, the Department must recalculate the pensions without regard to percentages and ceilings, and must then pay the additional

---

[3]A complete recitation of the details of the Department's current practices is not necessary to the resolution of this case and has not been included in this opinion. It suffices to state that the current practices result in significantly smaller pensions than did the previous practices.

benefits owed. The judge found that the estimated present value of the class recovery was approximately $18.8 million. The judge ordered the PERS I fund also to pay prejudgment and postjudgment interest on the amounts owed.

Judge Bever also awarded $1.5 million in attorney fees to the plaintiffs' attorneys under the equitable "common fund/common benefit" theory. The judge ruled the plaintiffs' attorneys had "created, protected and/or preserved a fund from which a reasonable attorneys' fee may be awarded". Under this theory, the attorney fee is taken from the plaintiff's overall recovery. The judge required the PERS I fund to immediately pay the attorney fees, and then ordered the benefited PERS I members to reimburse the PERS I fund through pro rata deductions from their increased benefits. The trial judge also awarded postjudgment interest on the attorney fee award, but did not specify the source of payment for this interest.

The Department appealed the court's rulings regarding the percentage and ceiling limitations as well as the awarding of interest and attorney fees. The plaintiffs cross-appealed from the trial court's ruling limiting pension calculations to leave that accrued during the 2-year AFC period as well as from the court's ruling on the statute of limitations. This court retained the matter for direct review under RAP 4.2.

## II

ISSUE 1. Should pension calculations include leave cashouts in their entirety or only the amount that compensates for leave accruing during the relevant 2-year period?

ISSUE 2. Do the Department's prior practices preclude it from taking an employer's *percentage* limitation into account in calculating PERS I pensions?

ISSUE 3. Do the Department's prior practices preclude it from taking an employer's *ceiling* limitation into account in calculating PERS I pensions?

ISSUE 4. Did the trial court err in awarding attorney fees?

ISSUE 5. Did the trial court err in requiring the PERS I fund to pay both prejudgment and postjudgment interest on the additional pension benefits?

ISSUE 6. Did the trial court err in limiting the class size based on a 3-year statute of limitations?

### III

■ In reviewing a summary judgment, an appellate court engages in the same analysis as the trial court. The appellate court determines whether genuine issues of material fact exist and whether the moving party is entitled to judgment as a matter of law. The appellate court considers the facts in the light most favorable to the nonmoving party. *Swanson v. Liquid Air Corp.*, 118 Wn.2d 512, 518, 826 P.2d 664 (1992); CR 56(c).

### ISSUE 1
#### INTERPRETING "AVERAGE FINAL COMPENSATION"

A PERS I pension is calculated as a percentage of the employee's "average final compensation". AFC is defined as *"the annual average of the greatest compensation earnable* by a member *during any consecutive two year period* of service for which service credit is allowed". (Italics ours.) RCW 41.40-.010(15)(a). "Compensation earnable" in turn is defined as *"salaries or wages earned* during a payroll period *for personal services"*. (Italics ours.) RCW 41.40.010(8)(a). Does "compensation earnable" include all of an employee's leave cashout, or only the cashout relating to the leave that accrued during the 2-year AFC period?

The plaintiffs argue that leave cashouts are not "earned" until they are received by the employees. They rely on a dictionary definition of "earn": "to *receive* (salary, wages, etc.) for one's labor or service". (Italics ours.) *Webster's New Twentieth Century Dictionary* 569 (2d ed. 1983). Brief of Respondents/Cross Appellants, at 70. They point out that although employees receive leave throughout the course of employment, employees receive *pay* for accrued leave only at retirement. They therefore argue the entire leave cashout is "earned" at

the termination of the employee's service. Because most employees' AFC period is their last 2 years of service, the entire leave cashout would be included in their AFC calculation.

The Department counters that leave cashouts are included in the AFC amount only to the extent that the leave *accrued* during the 2-year AFC period. It argues the definition of "compensation earnable" focuses on "salaries or wages" being earned through the performance of "personal services". The personal services are performed at the time the particular leave accrued, thus the earning takes place when the personal service is rendered, not when the leave is cashed out. Furthermore, it maintains that its interpretation better serves the statutory purpose of determining an employee's earning capacity during a 2-year period. In conclusion, it argues "[a] leave cashout is payment for previously earned and accrued leave." Reply Brief of Appellants (Department), at 35-36.

■ We agree with the Department's position. Leave, just like "salaries and wages", is earned when the employee performs the personal services. It can then be used at future times to allow the employee to take time off from work without losing pay, or it can sometimes be cashed out if it is not used during the period of employment. Under either of these scenarios, however, the compensation is "earned" at the time of the personal services, not at the later time when the employee receives the benefit of a day off or a cashout. The cashout is best characterized as a form of deferred compensation, earned at one time and received at another. The Department's argument therefore better fulfills the express language and the purpose behind the AFC statutory definitions.

■■ Additionally, the Attorney General issued an opinion agreeing that the Department's interpretation of this issue was correct. AGO 1 (1976). Although not controlling, Attorney General opinions are given "considerable weight". *Everett Concrete Prods., Inc. v. Department of Labor & Indus.*, 109 Wn.2d 819, 828, 748 P.2d 1112 (1988). Moreover, the Attorney General opinion constitutes notice to the Legis-

lature of the Department's interpretation of the law, and the Legislature has not acted since 1976 to overturn the Department's interpretation. Greater weight attaches to an agency interpretation when the Legislature acquiesces in that interpretation. *See Newschwander v. Board of Trustees,* 94 Wn.2d 701, 711, 620 P.2d 88 (1980).

We affirm the trial court's decision that a PERS I employee's pension should take into account leave cashouts only to the extent that the leave accrued during the employee's 2-year AFC period.

ISSUE 2

PAST PRACTICE AS TO PERCENTAGE LIMITATIONS

The next issue is whether the Department may further limit the effect of leave cashouts by considering the employers' percentage limitations, or whether instead the Department is bound to follow its previous practice of ignoring these limitations.

To recap, if an employer only cashes out a stated percentage of an employee's accrued leave, the Department's current practice is to use this limitation in a manner to correspondingly limit the number of days of accrued leave from the 2-year AFC period that would otherwise be included in calculating the AFC amount.

The Department's benefit calculators first became aware of these percentage cashouts during the 1970's. The record reveals this was certainly known by 1976. The Department calculators ignored the percentage limitations despite this knowledge. In 1980, the Department issued a memorandum to payroll officers of the State's political subdivisions indicating a "change in procedure". The memorandum stated that while under their "previous procedure" the Department had not taken percentage limitations into account, henceforth they would be considered. This change had the effect of reducing some employees' pension levels; whereas prior to 1980 all leave accruing during the 2-year AFC period was taken into account, after 1980 only a percentage of this leave was considered.

■ Public employee pension levels may be reduced only under limited circumstances. In *Bakenhus v. Seattle,* 48 Wn.2d 695, 698, 296 P.2d 536 (1956), this court held that public employee pension rights are contractual in nature, as the pension constitutes deferred compensation for services rendered. A public employee's right to a pension is "a vested, contractual right based on a promise made by the State at the time an employee commences service." *Washington Fed'n of State Employees v. State,* 98 Wn.2d 677, 683, 658 P.2d 634 (1983) (citing *Bakenhus,* 48 Wn.2d at 700).

Once an employee begins work, his or her pension rights may be modified only for limited purposes. Moreover, modifications reducing pension levels must be counterbalanced with increases in pension levels:

> Although pension rights may be modified prior to retirement, such modifications must be for the sole purpose of "keeping the pension system flexible and maintaining its integrity." Even where permitted, the modifications must be reasonable and a disadvantageous modification must be . . . accompanied by a corresponding benefit. If there is no counterbalance, the disadvantageous modification will be declared unreasonable.

(Citations omitted.) *State Employees,* 98 Wn.2d at 683-84 (quoting *Bakenhus,* 48 Wn.2d at 701). Violation of these rights by the State amounts to an unconstitutional impairment of contracts. *State Employees*; Const. art. 1, § 23.

In *Washington Ass'n of Cy. Officials v. Washington Pub. Employees' Retirement Sys. Bd.,* 89 Wn.2d 729, 575 P.2d 230 (1978), this court extended the holdings of *Bakenhus* and *State Employees* to reach pension reductions caused by an administrative body rather than the Legislature. We held that the Department lacked the authority to abolish its 25-year practice of including leave cashouts in calculating AFC amounts.

Despite *County Officials'* extension of the *Bakenhus* rule to cover administrative reductions in pension levels, the Department argues its change in procedure did not violate the employees' pension rights. In particular, the Department

66

presents three separate contentions in attempting to distinguish *County Officials* from the present case.

 First, the Department argues that the change was necessary in order to bring its practice in compliance with the statutes, and that it must be given leeway in correcting practices when errors become evident. It is difficult to give this argument much credence when the evidence shows that the Department waited some 4 to 10 years before acting to change its procedures. *See County Officials,* 89 Wn.2d at 732-34; *State Employees,* 98 Wn.2d at 687-88 (holding that even the Legislature cannot indirectly change a longstanding practice of the Department to the detriment of PERS I members).[4]

Second, the Department argues that pension rights cannot attach to the pre-1980 practices because PERS management never officially adopted or approved of those practices. *County Officials* demonstrates the inadequacy of this argument. The practice at issue in that case began in 1952, it was approved by the PERS director by 1960, and it was brought to the attention of the PERS board of directors by 1974. *County Officials,* 89 Wn.2d at 732. This court found relevant the length of time that the practice had been in place — 25 years — rather than the length of time that management had approved of the practice. *County Officials,* 89 Wn.2d at 733. We again decline to adopt the Department's position that an administrative practice cannot become binding until after the practice has been officially approved of by PERS managers. The proper focus is not on bureaucratic approval processes, but on the nature and duration of the administrative practices at issue.

Third, the Department contends that here, unlike in *County Officials,* the record contains evidence that the plaintiffs had *no* contractual expectation in having the pre-1980 practices

---

[4] In *State Employees,* the Legislature attempted to indirectly remove leave cashouts from AFC calculations by prohibiting the employers from cashing out accrued leave. This court held that just as the Department could not violate the employees' pension rights by abolishing its longstanding administrative practice, neither could the Legislature constitutionally achieve this end through indirect means. *State Employees,* 98 Wn.2d at 686-88.

followed. Two of the three named plaintiffs wrote to the Department in 1986 after the Department had apparently calculated a pension amount for one of the plaintiffs without giving any credit for that plaintiff's cashed out sick leave. In requesting that credit for the sick leave be granted, these plaintiffs proposed a calculation of benefits that took into account King County's 25 percent limitation on cashing out sick leave. Accordingly, the Department contends that the plaintiff class could have had no contractual expectation that pensions would be calculated pursuant to the pre-1980 practices.

The Department's argument relies on language in *County Officials* referring to contractual expectations:

> For 25 years, PERS has consistently included termination payments in the computation of "average final compensation." During this period numerous expectations based upon [the Department's] practice have arisen in the minds of current employee-members of the system. To now hold termination payments not includable would violate those expectations and be contrary to the position of this court first expressed in [*Bakenhus*].

*County Officials,* 89 Wn.2d at 733.

The Department seeks to transform this passage into a requirement that administrative practices do not violate pension rights unless the affected PERS I members knew about each technical interpretation by the Department and then consciously formed the expectation that each would continue. The Department reads too much into this passage. The Department's position ignores the fact that *Bakenhus* and *State Employees* do not pin their analyses on whether individual employees had specific expectations in certain practices. Rather, the cases established flat rules prohibiting the State from altering pension rights in a manner that is disadvantageous to the PERS I employees. These rules apply whether or not many of the employees knew the specifics of their pension rights and had any specific expectations in them.

Moreover, the Department's position would have the effect of requiring exhaustive fact-based investigations into the

precise knowledge and expectations held by individual PERS I employees and determinations about whether these expectations were sufficient to create vested rights. This approach is unworkable.

We look instead to whether the duration and nature of the administrative practice is such as to create vested rights in their future continuation. Here, the Department consistently and routinely refused to take into account employers' percentage limitations for a period of 4 to 10 years after learning of the existence of these limitations. The Department's own 1980 memorandum terms its action as a "change", not just a clarification, of practice. We conclude that after 4 to 10 years of consistent application, the practice was no longer in an experimental phase but had become an established policy.

We conclude the Department violated the pension rights of PERS I employees when it reduced pension levels by changing its practices with regard to employers' percentage limitations.

## ISSUE 3
### FIXED CEILING LIMITATIONS

If an employer places a flat ceiling on the amount of leave it will cash out upon retirement, the Department's current practice is to account for this limitation by using FIFO ("first in, first out") accounting principles to limit the number of days of accrued leave from the 2-year AFC period that would be included in calculating the AFC amount.

The plaintiffs allege this current practice represents a change in policy, for they point to statements from a Department benefit supervisor that the Department prior to 1984 did not take into account ceiling limitations. The Department's benefit calculators began learning as early as 1976 that some employers had ceiling limitations. Apparently the Department had used FIFO with regard to other types of pension calculations, but at most only once prior to 1984 with respect to ceiling limitations. In the early 1980's, the Department's assistant director of operations (a position at least 2 levels of supervisors above benefit calculators) became aware

of the ceiling limitations. In 1984, the Department developed forms for soliciting ceiling information from the employers so it could systematically account for ceiling limitations in calculating pensions. From 1984 on, the Department has taken ceiling limitations into account in calculating pensions. The Department does not contest that this change in practice served to reduce the size of PERS I pensions.

■ The parties' arguments are essentially the same as they presented with regard to the percentage limitations previously discussed in Issue 2. Moreover, the analysis we presented with respect to percentage limitations is equally applicable here for ceiling limitations. The facts support a conclusion that the Department changed its practices in 1984 regarding ceiling limitations. The effect of this change is to reduce pensions without providing any offsetting benefit for PERS I employees. As under Issue 2, the determinative question is whether the Department's pre-1984 practice of ignoring ceiling limitations was of a sufficient duration and nature to constitute a vested pension right. Given the 8-year period during which this practice occurred, the consistency of its application and its direct effect on pension levels, we conclude the Department violated the PERS I employees' pension rights.

## ISSUE 4
### ATTORNEY FEES
A. The Department as an "aggrieved party".

■ The plaintiffs maintain the Department may not challenge the award of attorney fees on appeal because it is not an "aggrieved party" under RAP 3.1. We disagree. Although the plaintiff class, and not the PERS I fund, bears the ultimate responsibility for paying the attorney fees, the trial court required the PERS I fund to advance the attorney fees on behalf of the plaintiff class subject to future reimbursement. This requirement creates a sufficient pecuniary involvement to render the Department an aggrieved party. *See Cooper v. Tacoma,* 47 Wn. App. 315, 316-17, 734 P.2d 541 (1987).

B. Authorization for the fee award.

■ Attorney fees may be awarded only if authorized by "contract, statute or recognized ground in equity". *Painting & Decorating Contractors of Am., Inc. v. Ellensburg Sch. Dist.,* 96 Wn.2d 806, 815, 638 P.2d 1220 (1982); *Seattle Sch. Dist. 1 v. State,* 90 Wn.2d 476, 540, 585 P.2d 71 (1978).

The trial court awarded attorney fees ($1.5 million) and costs ($17,000) to the plaintiffs' attorneys pursuant to the "common fund/common benefit" theory, a recognized ground in equity for granting attorney fees. *See Seattle Sch. Dist.,* 90 Wn.2d at 542-45. This theory is different from most other theories authorizing the granting of attorney fees, for here the award of fees is borne by the *prevailing* party, not the losing party. *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 481, 62 L. Ed. 2d 676, 100 S. Ct. 745 (1980).

The Department challenges the granting of fees under this theory for a handful of reasons. First, it contends the requirements of the "common fund/common benefit" theory have not been met. Second, it argues the amount of the fees was unreasonable. Third, it maintains requiring the PERS I fund to immediately pay the attorney fees, subject only to future reimbursement from benefited PERS I members, violates the state constitution's prohibition against the lending of state credit.

Washington's cases have discussed equitable theories of "common fund" and "common fund/common benefit" for recovering attorney fees. *See Leischner v. Alldridge,* 114 Wn.2d 753, 756-58, 790 P.2d 1234 (1990) (discussing common fund theory); *Miotke v. Spokane,* 101 Wn.2d 307, 339-40, 678 P.2d 803 (1984) (discussing common fund theory); *Seattle Sch. Dist.,* 90 Wn.2d at 541-45 (separately discussing theories of common fund and common fund/common benefit); *Painting & Decorating Contractors,* 96 Wn.2d at 815 (common fund/common benefit). While at an earlier time these theories carried different requirements, they are now generally phrased in the same manner. Each theory authorizes attorney fees only when the litigants preserve or create a common fund for the benefit of

others as well as themselves. *See Leischner,* 114 Wn.2d at 756-58; *Miotke,* 101 Wn.2d at 339-40; *Seattle Sch. Dist.,* 90 Wn.2d at 542-45; *Painting & Decorating Contractors,* 96 Wn.2d at 815.

Here, the plaintiffs argue their suit created or preserved a fund because the suit secured additional pension benefits for many other PERS I members. We agree. The plaintiffs have succeeded in requiring the Department to increase the pensions for a number of PERS I members. The costs of these increased pension benefits will not be absorbed by the existing fund itself, but will instead be passed along to the various employers covered by PERS I in the form of increased contributions to the system. *See* RCW 41.45.040(2)(a); RCW 41.50.150; Brief of Appellants (Department), at 50 n.13. The Department's own briefing in this case succinctly states this point:

> PERS I is a defined benefit plan. Statutory benefits are not proportional to contributions employees pay into the system. Employer contributions must be increased to whatever level becomes necessary to fund statutorily defined benefits. Therefore, all risk of a shortfall rests on state and local government employers and ultimately, on taxpayers.

Reply Brief of Appellants (Department), at 25.

The plaintiffs therefore have prevailed in increasing the funds available for payment of PERS I pensions. Because the plaintiffs have created a common fund for the benefit of others, their attorneys are entitled to attorney fees.

We note in passing that this holding also furthers important policy interests. When attorney fees are available to prevailing class action plaintiffs, plaintiffs will have less difficulty obtaining counsel and greater access to the judicial system. Little good comes from a system where justice is available only to those who can afford its price.

C. Reasonableness of the attorney fees.

The Department next challenges the amount of the fees awarded. The trial judge awarded fees of $1.5 million. The trial judge is given broad discretion in determining the

reasonableness of attorney fees. *Schmidt v. Cornerstone Invs., Inc.,* 115 Wn.2d 148, 169, 795 P.2d 1143 (1990).

The parties have raised arguments regarding two separate methods of calculating attorney fees. A "percentage of recovery" approach sets attorney fees by calculating the total recovery secured by the attorneys and awarding them a reasonable percentage of that recovery, often in the range of 20 to 30 percent. *See Six (6) Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir. 1990). By contrast, a "lodestar" approach sets the fees by first determining the number of hours that were reasonably spent by the attorneys, multiplying it by a reasonable hourly compensation, and then adjusting this amount upward or downward based on additional factors. *See generally Bowers v. Transamerica Title Ins. Co.,* 100 Wn.2d 581, 597-99, 675 P.2d 193 (1983).

The two approaches each have their own areas of proper application. "[T]he choice between lodestar and percentage calculation depends on the circumstances, but . . . 'either method may . . . have its place in determining what would be reasonable compensation for creating a common fund.' " *Arizona Citrus Growers,* 904 F.2d at 1311 (quoting *Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 272 (9th Cir. 1989)). While the lodestar method is generally preferred when calculating *statutory* attorney fees, the percentage of recovery approach is used in calculating fees under the common fund doctrine. *Arizona Citrus Growers,* 904 F.2d at 1311; *Blum v. Stenson,* 465 U.S. 886, 900 n.16, 79 L. Ed. 2d 891, 104 S. Ct. 1541 (1984). The primary explanation for this distinction is that *statutory* attorney fees are separately assessed against the defendant while common fund attorney fees are taken directly from the recovery obtained by the plaintiffs. In common fund cases, the size of the recovery constitutes a suitable measure of the attorneys' performance. *See In re GNC Shareholder Litig.: All Actions,* 668 F. Supp. 450, 451-52 (W.D. Pa. 1987).

In common fund cases, the "benchmark" award is 25 percent of the recovery obtained. *Arizona Citrus Growers,* 904

F.2d at 1311; *see also* 3 *Newberg on Class Actions* § 14.03 (2d ed. 1985) (20 to 30 percent is the usual common fund award). Under special circumstances, this figure can be adjusted upward or downward, or can be replaced with a lodestar calculation. *Arizona Citrus Growers,* 904 F.2d at 1311.

In this case, the plaintiffs' attorneys petitioned the trial judge for an attorney fee award of $2.75 million, a figure representing approximately 15 percent of the $18.8 million present value of the plaintiffs' recovery. None of the members of the plaintiff class filed any objection to this petition. The trial judge awarded attorney fees, but only in the amount of $1.5 million. The judge ruled this figure was reasonable under both approaches; the fee represented a lodestar amount of approximately $500,000 multiplied by a factor of 3 to reflect the difficulty of obtaining a recovery and the quality of the legal work performed, and the fee constituted 8 percent of the plaintiffs' recovery.

The Department primarily challenges the fee award with arguments directed to the lodestar approach. The Department maintains the lodestar figure improperly included time spent on claims upon which the plaintiffs did not prevail. The Department also disputes the use of a multiplying factor of 3 because it contends the record does not contain specific evidence establishing why the quality of the work performed was not already taken into consideration in the attorneys' hourly rate.

██ We reject these arguments. This being a common fund case, we apply the percentage of recovery approach. The Department's arguments relate only to the lodestar approach. Moreover, an award of fees under the percentage of recovery theory is not improper merely because it is three times the lodestar amount. *See In re GNC Shareholder Litigation,* 668 F. Supp. at 451. Here, where only 8 percent of the recovery was awarded, the Department has wholly failed to show that the fee awarded was excessive.

The Department's only other objection is that the percentage of recovery is inappropriate in this case because the PERS I fund was ordered to advance the fee — subject to

reimbursement from the benefited members of the plaintiff class upon the calculation of their new retirement benefits — and "there will be a real possibility that the PERS I fund will not collect back from benefiting retirees sufficient money to cover the full amount of the attorney fees" the PERS I fund was ordered to advance. Brief of Appellants (Department), at 50-51. The Department notes in this regard that the $18.8 million figure is only an estimate, and argues that inaccuracies in this estimate could mean the Department does not receive full reimbursement.[5]

The estimate of the present value of the class recovery was performed by the Office of the State Actuary. The Department has presented little reason why we should conclude the estimate is inaccurate. Moreover, the method that is used for calculating the fees does not change the risk that the Department might not receive full reimbursement. Given that the class recovery can only be estimated at this time, *either* method of calculating attorney fees will place the Department at risk of not receiving full reimbursement. In light of the deference we extend to trial court rulings in this area, we decline to overturn the amount of the fees awarded below.[6]

D. Lending of credit.

Finally, the Department contends that the trial court's award of attorney fees involves an unconstitutional lending of state credit. *See* Const. art. 8, § 5. This issue arises since the PERS I fund was ordered to advance the fees on behalf of the plaintiff class, subject to reimbursement by the individual class members.

In *State ex rel. State Employees' Retirement Bd. v. Yelle*, 31 Wn.2d 87, 195 P.2d 646, 201 P.2d 172 (1948), this

---

[5]For example, if the estimate turns out to be too large, then deducting only 8 percent of the additional pension amounts from each of the benefited class members will not lead to full reimbursement.

[6]During oral argument, the plaintiffs' attorneys invited this court to exercise its inherent power to *increase* the attorney fees awarded, even though the attorneys themselves had not cross-appealed from the fees awarded below. We decline this invitation.

court found the public employees' retirement system, consisting at that time solely of contributions made by public employees, was not a state or public fund, but a special fund of a proprietary nature. We see no reason to depart from the holding in *Yelle*, at least as far as it applies to *employee* contributions to the retirement system.

We thus find those funds held by PERS I that are employee contributions are not public funds and therefore are not subject to the constitutional restrictions contained in Const. art. 8, § 5.

Because the State has the ability to comply with the trial court order regarding the advancement of fees without implicating any portion of the retirement system funds which are attributable to *employer* contributions, we need not determine, in this case, whether the *employer* contributions are state or public funds which are subject to the prohibitions of Const. art. 8, § 5.

By finding the advancement of fees proper in this case, we in no way intend to sanction the lending of employee contributions except in rare circumstances where, as here, the advancement is pursuant to a court order entered in a case in which employee benefits are at issue and where the advancement is in the best interests of the beneficiaries of the fund.

E. Attorney fees on appeal.

 The plaintiffs' attorneys have requested an award of attorney fees for their work on this appeal. They base their request on a continuation of their common fund theory. We decline to award attorney fees on appeal. Under the percentage of recovery approach, the attorneys are to be compensated according to the size of the judgment recovered, not the actual hours expended. The plaintiffs have not increased the size of their recovery on appeal, thus we have no basis to increase their fees.

F. Interest on attorney fees and costs.

The trial judge awarded postjudgment interest on the attorney fee award but did not specify which party was to

pay that interest. It would, however, be inconsistent with the common fund theory to require the Department to pay interest on the attorney fee award. If interest on attorney fees and costs were to be paid in this case, such payment would be the responsibility of the plaintiff class, not the Department.

We find this case does not merit imposing upon the plaintiff class an award of postjudgment interest on attorney fees. *See Weiss v. Bruno*, 83 Wn.2d 911, 914, 523 P.2d 915 (1974). As support for the award of interest on attorney fees, attorneys for the plaintiff class rely on RCW 4.56.110(3).[7] RCW 4.56.110(3) is not controlling in this case since the award of attorney fees does not constitute a "judgment" within the meaning of the statute. Pursuant to the common fund theory, the attorney fees are being paid by the plaintiff class. Even though the Department will initially front the attorney fees, subject to reimbursement by the plaintiff class, the attorney fee award remains a liability of the plaintiff class. Since the plaintiff class and their own attorneys are not adverse parties, the attorney fee award does not constitute a judgment within the meaning of RCW 4.56-.110(3). We therefore reverse the trial court's award of postjudgment interest on attorney fees and costs.

ISSUE 5
INTEREST ON ADDITIONAL PENSION BENEFITS

The Department argues that RCW 39.76.020(7) excuses the PERS I fund from any obligation to pay interest on the additional pension benefits awarded to the plaintiff class. This argument requires analysis of the interplay between RCW 39.76.010 and .020. The first statute provides in relevant part:

> *Except as provided in RCW 39.76.020, every state agency and unit of local government shall pay interest* at the rate of one percent per month, but at least one dollar per month, *on*

---

[7]RCW 4.56.110(3) provides in part: "*judgments* shall bear interest from the date of entry at the maximum rate permitted under RCW 19.52.020 . . .." (Italics ours.)

*amounts due on written contracts* for public works, personal services, goods and services, equipment, and travel, whenever the state agency or unit of local government fails to make timely payment.

(Italics ours.) RCW 39.76.010(1).

The second statute provides the exception that comes into play in this case:

*RCW 39.76.010 does not apply to . . . [p]ayment from any retirement system listed in RCW 41.50.030 [including PERS I]* and chapter 41.24 RCW.

(Italics ours.) RCW 39.76.020(7).

The Department argues this last exception demonstrates a legislative intent that untimely pension payments not bear interest. The plaintiffs disagree. They argue that RCW 39.76-.010 applies only to *written* contracts, and pension payments are not based on any written contracts. *See Noah v. State*, 112 Wn.2d 841, 774 P.2d 516 (1989) (holding that the pension statute itself does not constitute a written contract between the State and its employees and noting that no other written contract exists between these parties). The plaintiffs thus maintain RCW 39.76.020(7) does not apply here because all it does is exempt the PERS I fund from having to pay interest on written contracts.

We reject the plaintiffs' interpretation as being far more restrictive than could have been intended by the Legislature. This court endeavors to avoid statutory interpretations that lead to unlikely, absurd or strained consequences. *See State v. Fjermestad*, 114 Wn.2d 828, 835, 791 P.2d 897 (1990). The only payments that retirement systems make are for pensions and for various administrative expenses. *See, e.g.*, RCW 41.40.080, .083. There is no reason for the Legislature to set up a special exemption for payments from retirement systems if all that is being exempted is administrative expenses. Far more logical is the assumption that the Legislature enacted RCW 39.76.020(7) out of a concern to keep a lid on governmental pension liabilities. Moreover, when this statute was enacted in 1981, the Legislature could easily have believed that pension payments *were* owed under

written contracts. This court had held since 1956 that the obligation to pay public employee pensions is contractual in nature, *see Bakenhus v. Seattle,* 48 Wn.2d 695, 698, 296 P.2d 536 (1956), and it was only in 1989 that this court definitively held in *Noah* that the PERS I statute itself did not constitute a written contract. Accordingly, we hold that the Legislature intended in RCW 39.76.020(7) to except PERS I pension payments from any interest requirements.

This holding precludes the attachment of prejudgment interest. *See Fiorito Bros., Inc. v. Department of Transp.,* 53 Wn. App. 876, 878-79, 771 P.2d 1166 (1989) (applying the statute to a claim for prejudgment interest, but not making any holding as to postjudgment interest). It likewise precludes postjudgment interest. Even though another statute states the general rule that judgments bear interest, *see* RCW 4.56.110, this general rule is subordinated by the more specific legislative decree that untimely pension payments are not subject to interest. *See In re Little,* 106 Wn.2d 269, 284, 721 P.2d 950 (1986) (when two statutes are in apparent conflict, the more specific statute is given preference).

Accordingly, we overturn the trial court's awarding of interest on the additional pension obligations.

### ISSUE 6
#### STATUTE OF LIMITATIONS

The trial judge ruled this action is governed by a 3-year statute of limitations that begins to run upon an employee's separation from service. Accordingly, the judge limited the plaintiff class to those PERS I employees who had not yet retired or who had retired within 3 years preceding the filing of the lawsuit.

A 3-year statute of limitations applies to actions alleging a breach of state employee pension rights. *Noah v. State,* 112 Wn.2d 841, 774 P.2d 516 (1989). In *Noah,* this court recognized that this limitations period begins to run upon the employee's retirement from service. *Noah,* 112 Wn.2d at 843 (measuring whether the 3-year statute of limitations had

been exceeded by examining the interval between the employees' dates of retirement and the date when the action was commenced).

Despite this clear and recent holding, the plaintiffs ask us to apply different limitation rules. They argue the PERS I fund is an express trust. When an express trust is at issue, the statute of limitations does not begin to run as long as the express trust "subsists"; it begins to run only when the trustee repudiates or terminates the trust. *See Department of Rev. v. Puget Sound Power & Light Co.,* 103 Wn.2d 501, 509, 694 P.2d 7 (1985) (quoting *Arneman v. Arneman,* 43 Wn.2d 787, 797, 264 P.2d 256, 45 A.L.R.2d 370 (1953)); *Skok v. Snyder,* 46 Wn. App. 836, 838-39, 733 P.2d 547 (1987); G. Bogert, *Trusts and Trustees* § 951 (2d rev. ed. 1982). The repudiation must be plain, strong, and unequivocal and must be brought home to the beneficiary. *Skok,* 46 Wn. App. at 840. The plaintiffs argue the trust still exists and has not been repudiated, thus the statute of limitations has not yet begun to run.

We decline to overturn *Noah.* This opinion, written only 3 years ago, unequivocally establishes the applicable statute of limitations and the date upon which the limitations period begins to run. Moreover, we have already rejected a characterization of the PERS I fund as a trust. In *Marysville v. State,* 101 Wn.2d 50, 676 P.2d 989 (1984), the trial court had held that the State does not receive employer contributions in its sovereign capacity, but rather held them as trustee for the benefit of the PERS I employees. We disagreed, reasoning that PERS I employees have no claim on the fund until they complete their term of employment and qualify for a pension. *Marysville,* 101 Wn.2d at 56. If the employer contributions are not held by the State as a trustee, then we cannot construe the PERS I fund as a trust.

The plaintiffs present one additional argument regarding the running of the statute of limitations. They contend the discovery rule operates in this case to delay the running of the statute of limitations. Under the discovery rule, a

cause of action does not accrue — and as a result the statute of limitations does not begin to run — until the plaintiff knows, or has reason to know, the factual basis for the cause of action. *See, e.g., Reichelt v. Johns-Manville Corp.,* 107 Wn.2d 761, 769, 733 P.2d 530 (1987). This court, however, has held that the discovery rule only applies to "certain torts". *See White v. Johns-Manville Corp.,* 103 Wn.2d 344, 348, 693 P.2d 687, 49 A.L.R.4th 955 (1985). Even in tort actions, the rule does not apply beyond a limited range of areas: professional malpractice, occupational diseases, self-reporting and concealment. *See In re Estates of Hibbard,* 118 Wn.2d 737, 749, 826 P.2d 690 (1992). The plaintiffs have not even begun to address these questions. We decline to extend the discovery rule in the manner requested by the plaintiffs in the absence of adequate briefing. *See State v. Elliott,* 114 Wn.2d 6, 15, 785 P.2d 440, *cert. denied,* 498 U.S. 838, 112 L. Ed. 2d 80, 111 S. Ct. 110 (1990).

Accordingly, we affirm in part and reverse in part.

ANDERSEN, C.J., and UTTER, BRACHTENBACH, DURHAM, SMITH, and GUY, JJ., concur.

After modification, further reconsideration denied April 29, 1993.