

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE AUG 1 8 2016

for CHIEF JUSTICE

This opinion was filed for record

at 8:00 am on Aug. 18, 2016

SUSAN L. CARLSON
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| TIM LENANDER, | ) | No. 92671-9 |
| Appellant, | ) ) | |
| v. | ) ) | En Banc |
| WASHINGTON STATE DEPARTMENT OF RETIREMENT SYSTEMS, | ) ) ) | Filed AUG 1 8 2016 |
| Respondent. | ) ) ) | |

WIGGINS, J.—Employees retiring from the Washington State Patrol are eligible to receive a pension calculated based on years of service and average final salary. For many years, the only pension benefit option available included a survivor benefit for a spouse who outlived the retiree that was usually equal to 50 percent of the retiree's monthly benefit. In 2000, the Department of Retirement Systems (DRS) created a new option under which the retiree could opt for a pension that would allow a surviving spouse to continue to receive monthly pension benefits at the same amount after the retiree's death. To make this pension actuarially equivalent in value to the previous pension, the DRS provided for a greater reduction in the retiree's monthly benefits. In 2010, the DRS adopted rules that modified the degree of the actuarial reduction. Appellant Tim Lenander challenges the changes to the reduction, arguing that it violates the statutory scheme and impairs his contract right to a lower reduction in his pension payment.

We reject Lenander's arguments. The plain language of the Washington State Patrol Retirement System (WSPRS) "Plan 1" survivor benefit statute, read in the context of its overall statutory scheme, grants authority to the DRS to adopt rules establishing an actuarially equivalent survivor option, and broad authority to adopt and revise actuarial factors for purposes of administering the state's public retirement systems. We therefore hold that the DRS acted within its statutory authority. Additionally, the DRS did not violate the contract clause of article I, section 23 of the Washington Constitution. The decision of the Thurston County Superior Court is affirmed.

## BACKGROUND

A brief discussion of the relevant statutory and regulatory history of WSPRS Plan 1, as well as a discussion of the facts of this case, provides the necessary context for our decision.

I.      WSPRS Statutes and the Option B Regulations

WSPRS Plan 1 provides monthly retirement benefits to qualifying Washington State Patrol officers commissioned on or before January 1, 2003. *See* RCW 43.43.270. Historically, WSPRS Plan 1 members had only one option for their retirement benefits: a monthly retirement allowance calculated based on the retiree's final average salary and years of service. RCW 43.43.270(2). If the member passed away, either in service or after retirement, the member's spouse would automatically receive a survivor allowance—usually equal to 50 percent of the member's average final salary—at no additional cost to the member.

In 1999, the legislature enacted a law directing the DRS to adopt rules creating a new survivor benefit option for WSPRS retirees that would provide for a continuing, unreduced retirement allowance for surviving spouses. LAWS OF 1999, ch. 74, § 4 (codified as amended at RCW 43.43.278). The legislature required that this new option be actuarially equivalent to the historic option for WSPRS Plan 1 members. *Id.*

In 2000, pursuant to RCW 43.43.278, the DRS adopted a rule implementing the legislative mandate to create an uncapped survivor benefit option. Clerk's Papers (CP) at 97 (Rule-Making Order, Wash. St. Reg. 00-11-103 (May 18, 2000)). This rule established two retirement options: "Option A" (the "historic retirement option" with historic survivor benefit) and "Option B" (the "actuarially equivalent retirement option" with new survivor benefit). Former WAC 415-103-215 (2000). In order to offset the continuing benefits provided to the survivor and ensure that the plan was actuarially equivalent, the monthly retirement allowance was actuarially adjusted by a reduction factor.[1]

The Office of the State Actuary (OSA), which is responsible for conducting actuarial services for, and periodic studies of, the state retirement systems, recommended a flat actuarial reduction factor of three percent for Option B. Admin. Record (AR) at 77; *see also* RCW 44.44.040. This meant that upon choosing Option B,

---

[1] Actuarial factors are specific percentages used by the DRS to calculate adjustments to retirement benefits for different benefit options, such as an offset to pay for providing a survivor benefit. *See* CP at 31; WAC 415-02-300(1). "The department adopts actuarial factors upon the office of the state actuary's (OSA) recommendation, following OSA's investigation into the mortality, service, compensation, and other experience of retirement plan members, retirees, and beneficiaries." WAC 415-02-300(2).

a member's retirement allowance would be reduced by three percent,[2] but that allowance would continue at that same rate through the lifetime of his or her surviving spouse. Former WAC 415-103-215 (2000).

In 2007, the OSA completed its six-year periodic actuarial investigation (2001-2006) into each of the state retirement systems. CP at 361. Based on the results of this study, the OSA recommended that the DRS adopt a table of factors, rather than a single reduction factor. *Id.* The OSA explained that the switch in format to a table of factors that vary by age difference would "provide better actuarial equivalence." CP at 364.

Upon receiving this advice from the OSA, the DRS amended WAC 415-103-215, removing the reference to the three percent actuarial reduction, stating instead:

> The department pays the retiree a monthly retirement benefit *that is actuarially reduced from the benefit calculated under Option A.* The department pays survivor benefits in accordance with RCW 43.43.278 *using actuarial factors in WAC 415-02-380* (10) and (11).

Former WAC 415-103-215(3) (2010) (emphasis added). The DRS simultaneously amended WAC 415-02-380 to include a table of survivor benefit reduction factors for WSPRS Plan 1 Option B that based varying actuarial reduction rates on the age difference between member and spouse. Former WAC 415-02-380(10), (11) (2010). The new rules went into effect September 1, 2010. CP at 152.

---

[2] There is no documentation as to why the DRS initially adopted the three percent reduction factor, or why it chose a single factor over a table of varying factors. However, in light of the absence of evidence to the contrary, both parties admit this calculation was actuarially equivalent.

II.     Tim Lenander

Lenander became a commissioned trooper and a member of WSPRS on July 2, 1987. AR at 4. He was an active, contributing member of WSPRS until his retirement on August 9, 2011. *Id.* Lenander is married, and upon retirement, he selected Option B for his WSPRS monthly retirement benefit. *Id.* This retirement benefit will continue for the lifetime of his wife, if she survives him. *Id.* When Lenander retired, the age difference between him and his wife was calculated as two years. *Id.* at 5. Based on the newly adopted table of actuarial factors at former WAC 415-02-380 (2010), and pursuant to former WAC 415-103-215(3) (2010), the DRS calculated his actuarial reduction factor at 5.3 percent (or 94.7 percent of the monthly pension payout). *Id.*

Lenander filed a lawsuit in superior court,[3] seeking declaratory judgment invalidating the newly adopted actuarial factors on statutory and constitutional grounds. CP at 135-39. He simultaneously sought an administrative appeal before the DRS, challenging the validity of the calculation of his reduction factor. AR at 1. In the administrative proceeding, the DRS held the actuarial reduction was properly calculated. *Id.* Lenander appealed the DRS's decision to the superior court. *Id.* at 124. His constitutional challenge and rule challenge cases were ordered consolidated by the superior court. CP at 752.

The superior court denied Lenander's claims for relief. Lenander appealed, and we granted direct review pursuant to RCW 2.06.030.

---

[3] This lawsuit was commenced by a different retiree, but Lenander was later substituted as plaintiff. CP at 585.

5

ANALYSIS

At its core, this case presents issues of statutory interpretation. We are called on to interpret the scope of the DRS's authority to establish actuarial factors for the WSPRS Plan 1 system, and to determine whether its powers also include the authority to revise and update the factors once adopted.

I.  Standard of Review

The Washington Administrative Procedure Act (APA) governs the standard of review for a challenge to an agency rule. The burden is on the challenger asserting invalidity of an administrative rule—in this case, Lenander. *See* ch. 34.05 RCW; *Wash. Pub. Ports Ass'n v. State Dep't of Revenue*, 148 Wn.2d 637, 645, 62 P.3d 462 (2003). An agency rule may be invalidated only if the court determines it (1) is unconstitutional, (2) is outside the statutory authority of the agency, (3) is arbitrary or capricious, or (4) was adopted without complying with statutory rule making procedures. RCW 34.05.570(2)(c). Lenander claims that the amendments to WAC 415-103-215 are invalid because the DRS exceeded its statutory authority in promulgating the rule and that the rule changes were unconstitutional.

Determining the extent of rule making authority is a question of law. *Wash. Pub. Ports Ass'n*, 148 Wn.2d at 645. The construction and meaning of a statute is a question of law, which we review de novo. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). When possible, the court derives legislative intent from the plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, amendments to the provision, and the statutory scheme as a whole. *Id.* at 10-11.

Constitutional issues are also questions of law that we review de novo. *State v. Gresham*, 173 Wn.2d 405, 419, 269 P.3d 207 (2012). We begin with the presumption that a statute is constitutional and place "'the burden to show unconstitutionality . . . on the challenger.'" *In re Estate of Hambleton*, 181 Wn.2d 802, 817, 335 P.3d 398 (2014) (alteration in original) (quoting *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 215, 143 P.3d 571 (2006)).

## II. The DRS Acted within Its Statutory Rule Making Authority

Lenander first challenges the authority of the DRS to amend its own regulations concerning Option B. He argues that because the statute directing the creation of Option B included a date certain for enactment of the Option B regulations and did not expressly include language reserving the right to make future amendments or changes thereto, the DRS did not have authority to make future amendments. Br. of Appellant at 14-15. We do not read the DRS's authority to be so limited. We hold that DRS acted within its statutory rule making authority in amending WSPRS Option B regulations to adopt actuarial reduction factors that provide for a better estimation of actuarial equivalence. When examining the WSPRS statute as a whole—in conjunction with related statutes defining the scope of the DRS's authority—it is clear that the DRS retained authority to amend its own rules consistent with legislative intent.

Administrative agencies have only those powers expressly granted by statute or are necessarily implied from the legislature's statutory delegation of authority. *Tuerk v. Dep't of Licensing*, 123 Wn.2d 120, 124-25, 864 P.2d 1382 (1994). "Agencies have implied authority to carry out their legislatively mandated purposes." *Id.* at 125. When the legislature grants power to an agency, it also grants by implication "'everything

7

lawful and necessary to the effectual execution of the power.'" *Id.* (quoting *State ex rel. Puget Sound Navigation Co. v. Dep't of Transp.*, 33 Wn.2d 448, 481, 206 P.2d 456 (1949)).

In 1999, the legislature delegated express authority to the DRS to create rules adopting a continuing survivor benefit for WSPRS Plan 1 members. RCW 43.43.278. Specifically, the DRS was instructed:

> By July 1, 2000, the department of retirement systems shall adopt rules that allow a member to select, in lieu of benefits under RCW 43.43.270, an *actuarially equivalent retirement option* that pays the member a reduced retirement allowance and upon death shall be continued throughout the life of a lawful surviving spouse. . . .

LAWS OF 1999, ch. 74, § 4 (emphasis added) (codified as amended at RCW 43.43.278[4]). Lenander does not challenge the DRS's initial rule adoption pursuant to this statutory grant of authority, only that it lacked the authority to later make amendments to that rule. Br. of Appellant at 15. The DRS argues that when RCW 43.43.278 is read in conjunction with other related statutes defining its authority, it is clear that the DRS had authority to adopt updated actuarial factors and thus its rule change was consistent with its statutory charge. Br. of Resp't at 21-22.

When interpreting a statute, the court's fundamental objective is to ascertain and give effect to the legislature's intent. *Hama Hama Co. v. Shorelines Hr'gs Bd.*, 85 Wn.2d

---

[4] The text of RCW 43.43.278 was amended in 2000, wherein the legislature removed the language stating the new option was "in lieu of benefits under RCW 43.43.270." LAWS OF 2000, ch. 186, § 9. This cross-referenced statute, RCW 43.43.270, sets forth the historic Plan 1 benefit (Option A). Even though the express reference to that provision was removed, RCW 43.43.278 still requires that the new option be actuarially equivalent to the benefits outlined in RCW 43.43.270. The 2000 changes to the statute have no bearing on the issue of the DRS's rule making authority in this case.

8

441, 445, 536 P.2d 157 (1975). We begin with the plain meaning of the statute. *See Campbell & Gwinn*, 146 Wn.2d at 9. In doing so, we consider the text of the provision in question, the context of the statute in which the provision is found, related provisions, amendments to the provision, and the statutory scheme as a whole. *Id.* at 10-11. If the meaning of the statute is plain on its face, then we must give effect to that meaning as an expression of legislative intent. *Id.* If, after this inquiry, the statute remains ambiguous or unclear, it is appropriate to resort to aids of construction and legislative history. *Id.* at 12.

The legislature created the DRS in 1976[5] and vested the agency with the authority to administer all of the state retirement systems, including WSPRS. LAWS OF 1976, 2d Ex. Sess., ch. 105, §§ 4, 11 (codified at ch. 41.50 RCW); *see also* RCW 41.50.030. When the DRS was created, the legislature granted the director of the DRS the authority to "[a]dopt such rules and regulations as are necessary to carry out the powers, duties, and functions of the department" consistent with the APA. RCW 41.50.050(5). In conjunction with establishing the DRS, the legislature also created the OSA[6] and directed that all "actuarial services required by the department [of retirement systems] shall be performed by the state actuary." LAWS OF 1976, 2d Ex. Sess., ch. 105, §§ 11(1), 19(1), 22(1).

---

[5] Prior to 1976, authority for administering each of the various state retirement systems was vested in individual retirement boards, which were specific to each retirement plan. LAWS OF 1947, ch. 250, §§ 2(A), 3. Upon its creation, the DRS assumed all responsibilities and powers previously held by the retirement boards. LAWS OF 1976, 2d Ex. Sess., ch. 105, § 11.

[6] Prior to 1976, the retirement boards hired independent, private actuaries to provide actuarial services for the retirement systems. LAWS OF 1947, ch. 250, § 9.

In 1989, the legislature revised the actuarial funding for all of the state retirement systems. LAWS OF 1989, ch. 273 (codified at ch. 41.45 RCW). This law directed the DRS and the OSA to coordinate roles regarding actuarial assessments and calculations for the WSPRS system. Under this law, the DRS is charged with collecting the data necessary for an actuarial investigation and valuation of all state retirement systems. RCW 41.45.090. Additionally, every six years the state actuary is required to conduct an actuarial experience study analyzing the mortality, service, compensation, and experience of the members of each retirement system, and an actuarial investigation into the financial condition of each system. RCW 41.45.090. Upon the completion of these actuarial studies, the state actuary must give the results to the DRS. *Id.*

The legislature vested the DRS with broad authority to adopt regulations and actuarial factors as necessary in response to the findings of the state actuary's investigations:

> Upon the basis of such actuarial investigation [by the state actuary] the department *shall adopt* such tables, schedules, factors, and regulations, as are deemed necessary in light of the findings of the actuary for the proper operation of the state retirement systems.

*Id.* (emphasis added). This grant of authority to the DRS was made in 1989, 10 years prior to the enactment of the WSPRS Option B survivor benefit legislation.

Read as a whole, it is clear the legislature understood when enacting the new survivor benefit legislation that actuarial data and valuation are not constant, static concepts. The legislature gave the DRS the flexibility and authority to make periodic changes to its regulations in light of the state actuary's recommendations. *Id.*; RCW 41.50.030. We presume the legislature enacts laws with the full knowledge of

10

existing laws. *Jametsky v. Olsen*, 179 Wn.2d 756, 766, 317 P.3d 1003 (2014). When the legislature in 1999 delegated to the DRS authority to create rules establishing an "actuarially equivalent" survivor benefit option, it did so in light of this statutory scheme for selecting and revising actuarial factors. This scheme gave the DRS broad authority to make changes as necessary under chapters 41.45 and 41.50 RCW to ensure that actuarial calculations remain actuarially sound, and that the state retirement systems maintain their integrity.

Lenander ignores this larger statutory scheme and instead points to the lack of an express reservation clause in the WSPRS statute. He argues that without this express language, the DRS lacks the authority to amend WSPRS Option B. Br. of Appellant at 15-16. He notes that the legislature, when directing the DRS to create similar survivor benefit options for other retirement systems, included express reservation language authorizing the DRS to make future amendments to actuarial factors, but failed to do so for WSPRS. Reply Br. of Appellant at 20-22; *see also* LAWS OF 2000, ch. 186.

Express reservation language is not necessary in this case as the amendments at issue are authorized by the broader statutory scheme. We previously considered and decided this issue in *King County Employees' Ass'n v. State Employees' Retirement Board*, 54 Wn.2d 1, 336 P.2d 387 (1959). The case challenged the State Employees' Retirement System[7] board's authority to adopt updated actuarial factors—under nearly

---

[7] Our decision in *King County Employees' Ass'n* concerned provisions of the "State Employees' Retirement System," codified at chapter 41.40 RCW. *See King County Emps.' Ass'n*, 54 Wn.2d at 3. Today, these statutes are referred to as the "Washington Public Employees' Retirement System." *See* RCW 41.40.020.

11

identical statutory language. At the time, members of this plan could choose to receive retirement benefits in the form of an annuity;[8] the annuity was required by statute to be the "'actuarial equivalent'" of the accumulated contributions at the time of retirement. *Id.* at 8 (quoting former RCW 41.40.190 (1953)). The retirement board initially adopted a mortality table for male lives as the basis for the computation of annuity benefits for both male and female retirees. *Id.* at 3. Later, the retirement board adopted separate male and female mortality tables. *Id.* at 3-4. The statutory scheme did not at the time include an express reservation of the right to modify the actuarial factors. However, the statutory scheme did include provisions requiring periodic actuarial investigations of the retirement system, and provisions authorizing the retirement board to adopt tables and factors as were deemed necessary in light of the actuary's findings, *id.* at 8, much like the present WSPRS scheme.

Interpreting the plain meaning of the statute, this court concluded that the term "actuarial equivalent" in the retirement statute reasonably required the use of the most accurate tables available. *Id.* "When the legislature gave the retirement board the responsibility for making effective the provisions of the retirement act, it simultaneously gave to the board 'the authority to make all rules and regulations necessary therefor.'" *Id.* at 9. This court held that the retirement board had "the power to adopt new mortality tables from time to time for the purpose of endeavoring to reflect the accurate life expectancy of members when they retire." *Id.*

---

[8] "An annuity is defined as the monthly 'payments for life derived from accumulated contributions of a member.'" *King County Emps.' Ass'n*, 54 Wn.2d at 7 (quoting former RCW 41.40.010(7), now codified as RCW 41.40.010(5)).

Like the retirement board in *King County Employees' Ass'n*, the DRS has authority to "[a]dopt such rules and regulations as are necessary to carry out the . . . duties . . . of the department," RCW 41.50.050(5), and to adopt actuarial "tables, schedules, factors, and regulations as are deemed necessary" in light of the periodic actuarial investigations by the state actuary, RCW 41.45.090. Based on this statutory scheme, we hold that the DRS has authority to amend its regulations to ensure benefits for WSPRS Plan 1 remain actuarially equivalent.

We also reject Lenander's argument based on the text of the DRS's own regulations. Lenander points to specific DRS regulations expressly reserving the right to amend actuarial factors for other retirement systems, and contrasts this language to the WSPRS Plan 1 Option B regulations that do not include such language. Br. of Appellant at 19-22. Lenander argues that the absence of express reservation language for Option B in the regulations is determinative, and shows that the DRS always regarded WSPRS as "different." *Id.* at 19. This argument misses the point of our analysis. The scope of an agency's authority is set by legislative enactment, not by its own regulations. An agency's rules or regulations cannot amend or alter legislative enactments. *Tuerk*, 123 Wn.2d at 125. "[A]lthough we generally accord substantial deference to agency decisions, we do not defer to an agency the power to determine the scope of its own authority." *In re Registration of Elec. Lightwave, Inc.*, 123 Wn.2d 530, 540, 869 P.2d 1045 (1994) (citation omitted). In light of the statutory text and framework, we conclude that the DRS had authority to amend its regulations to update its actuarial factors.

13

Furthermore, Lenander's position would have the peculiar result of requiring the DRS to treat WSPRS Plan 1 differently from all other retirement plans, without any indication that the legislature intended such result. Lenander challenges the DRS's authority to amend WAC 415-02-380 to change only the WSPRS Plan 1 Option B actuarial factors, and does not argue that the DRS lacked authority to amend this regulation to update factors for other retirement systems. Yet RCW 41.45.090 grants the DRS authority to adopt new and updated actuarial factors for *all* of the state retirement systems, including WSPRS. *See* RCW 41.45.090 (authorizing the DRS to adopt actuarial factors as necessary for the "state retirement systems"), .020(10) (defining "[s]tate retirement systems" as the systems listed in RCW 41.50.030); RCW 41.50.030(d) (listing WSPRS). Lenander's proposed reading of the statutes would, in effect, render the inclusion of WSPRS in RCW 41.45.090 meaningless.

Moreover, Lenander's position would in effect limit the DRS to using outdated or rejected actuarial factors and methodology for WSPRS Plan 1 alone. We do not read the statutes to create such a result when the legislature regularly lumped the state retirement systems together for similar treatment by the DRS. *See, e.g.*, RCW 41.45.035 (authorizing adoption of investment rate of return assumptions across WSPRS and other state retirement systems), .090 (authorizing DRS's authority in collection of actuarial data for all state retirement systems); RCW 41.50.005(1) (stating policy intent for the DRS that "[t]he retirement systems of the state shall provide similar benefits wherever possible").

III. The 2010 Changes to the WSPRS Regulations Fell within the Scope of the DRS's Authority

Lenander argues that even if we hold that the DRS had implied authority to amend the Option B rule, the particular regulations adopted exceeded the scope of the agency's authority. Lenander argues that the DRS was limited to amending the regulations establishing the actuarial equivalent benefit based on a new interest rate or mortality rate. He bases this argument on the language in the WSPRS statutes defining "actuarial equivalent" with reference to only two actuarial factors:

> "Actuarial equivalent" shall mean a benefit of equal value when computed upon the basis of *such mortality table* as may be adopted and *such interest rate* as may be determined by the director.

RCW 43.43.120(1) (emphasis added). This definition has been in place in the statute since 1951. *Compare* LAWS OF 1951, ch. 140, § 1(o), *with* RCW 43.43.120(1). Lenander argues that pursuant to this definition, the DRS has implied authority to amend the three percent actuarial reduction only if there is a change in either the mortality table or interest rate (or both). Br. of Appellant at 19. We reject this argument.

"We presume that administrative rules adopted pursuant to a legislative grant of authority are valid, and we will uphold such rules if they are reasonably consistent with the controlling statute." *Wash. Pub. Ports Ass'n*, 148 Wn.2d at 646. Additionally, we have held that agencies may adopt rules to fill in gaps in legislation where doing so is necessary to the effectuation of a general statutory scheme. *Hama Hama Co.*, 85 Wn.2d at 448. Because Lenander claims that the amended rule exceeds the scope of the DRS's statutory authority, he has the burden of showing that the amended rule is in

conflict with the intent and purpose of the statute. *See Wash. Pub. Ports Ass'n*, 148 Wn.2d at 646.

Resolution of this issue turns on the proper interpretation of "actuarial equivalent" in the WSPRS statute. The statutory definition of "actuarial equivalent" requires a benefit be of "equal value" based on a mortality rate and interest rate selected by the DRS. RCW 43.43.120(1). This language indicates these two factors are relevant to the calculation of "equal value" but says nothing about when or how the DRS may make changes to these factors. To the extent Lenander's argument suggests there must be a demonstrable change in these rates in order to make adjustments to the actuarial equivalency calculation, we reject his arguments. The plain text of the statutes say nothing about requiring a demonstrable change in the interest rate or mortality rate as a prerequisite to the adoption of new actuarial factors, and we will not read such additional language into the statute. Neither do we read the references to the two actuarial factors in RCW 43.43.120(1) as limiting the expansive authority granted to the DRS to adopt such actuarial factors, tables, schedules, and regulations as it deems necessary in light of the recommendations of the state actuary under RCW 41.45.090. Here we undertake the task of construing statutes in pari materia, i.e., the WSPRS statutes and others under the DRS umbrella. In this situation, it is this court's paramount duty to discern and give effect to the intent of the legislature. *Hama Hama Co.*, 85 Wn.2d at 445. Statutes relating to the same subject are to be read together so as to constitute a unified whole. *Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n*, 123 Wn.2d 621, 630, 869 P.2d 1034 (1994). Where possible, we will read statutes as complementary, rather than in conflict with each other. *Id.* To the extent there are

16

apparent conflicts between statutes, courts generally resolve such conflicts by giving "'preference to the more specific and more recently enacted statute.'" *Gorman v. Garlock, Inc.*, 155 Wn.2d 198, 210, 118 P.3d 311 (2005) (quoting *Tunstall v. Bergeson*, 141 Wn.2d 201, 211, 5 P.3d 691 (2000)). "Furthermore, in interpreting conflicting statutory language, a court may ascertain legislative intent by examining the legislative history of particular enactments." *Id.* at 211.

We conclude that these statutes can be harmonized so as to give effect to all language and carry out the legislative intent to provide for an actuarially sound and funded retirement system. The statutory scheme for the collection and application of actuarial valuations for WSPRS has undergone significant changes since the definition of "actuarial equivalent" was added to the statute in 1951. In 1989, when the legislature granted the DRS authority to periodically adopt actuarial factors and regulations as necessary, it announced its intent was "to provide a dependable and systematic process for funding the benefits provided to members" of WSPRS. LAWS OF 1989, ch. 273, § 1 (codified at RCW 41.45.010). To address the problem of unfunded liabilities in the state retirement systems, this legislation enacted employer contribution rates for the state retirement systems (including WSPRS) to ensure the full funding of future pension benefits. S.B. REP. ON SUBSTITUTE S.B. 5418, 51st Leg., Reg. Sess. (Wash. 1989). At the same time, the legislature took note of the role that accurate actuarial valuations—which assess the system's future liabilities—will play in determining the rate of contributions necessary to ensure full funding for the benefits paid out. *Id.* This legislative purpose is best effectuated by an interpretation that allows the DRS to utilize a range of relevant actuarial factors to come to the most accurate calculation of

actuarial equivalence and thereby ensures the DRS pays out benefits accurately. Such a reading will ensure that the benefits paid out to retirees do not exceed their actual value and threaten the integrity of the system's funding.

Reading these provisions in harmony with each other, we hold that the DRS has broad authority under RCW 41.45.090 to adopt such factors as it deems necessary for the purpose of calculating a WSPRS survivor benefit of "equal value" but, at a minimum, it must consider and adopt a mortality rate and interest rate it deems appropriate, consistent with the language of RCW 43.43.120(1). This interpretation gives effect to all language used by the legislature and is consistent with the legislative intent to create a retirement system that is more actuarially sound. Based on this interpretation, we hold that the DRS properly relied on recommendations from the state actuary in updating the Option B actuarial factors, and that the 2010 changes to WAC 415-103-215 and WAC 415-02-380 were valid.

IV.  The DRS Did Not Violate the Contract Clause

Lenander claims a contractual right to the three percent reduction factor set forth in the original Option B regulations. Br. of Appellant at 31. Because the application of the 2010 amended actuarial factors resulted in a greater reduction in his monthly benefits (5.3 percent), Lenander argues the rule, as applied to him, is an unconstitutional impairment of his pension benefits contract. Br. of Appellant at 28. We affirm the lower court's denial of Lenander's constitutional claim.

Article I, section 23 of the Washington Constitution provides that "[n]o . . . law impairing the obligations of contracts shall ever be passed." *See also* U.S. CONST. art. I, § 10 ("No State shall . . . pass any . . . law impairing the obligation of contracts."). We

give these provisions of our federal and state constitutions the same effect in Washington. *Wash. Educ. Ass'n v. Dep't of Ret. Sys.*, 181 Wn.2d 233, 242, 332 P.3d 439 (2014) (*WEA I*). While deference to the legislature is warranted when a private contract is impaired, we are more stringent in our review of state action that impairs a public contract. *Id.* at 242.

The three-part test for the impairment of public contracts applies to public pension contract impairment cases. *Id.* at 243-44. Under this test, a constitutional violation will be found only if the challenged action substantially impairs an existing contract and, even then, only if the action was not reasonable and necessary to serve a legitimate public purpose. *Id.* at 243. The test has three prongs, under which we ask: (1) Does a contractual relationship exist, (2) does the legislation substantially impair the contractual relationship, and (3) if there is substantial impairment, is the impairment reasonable and necessary to serve a legitimate public purpose? *Id.*

In public pension contract impairment cases, we analyze this three-part test in conjunction with the standards set forth in *Bakenhus v. City of Seattle*, 48 Wn.2d 695, 296 P.2d 536 (1956), for modifications to public pension contracts. In *Bakenhus*, we held that prior to retirement, an employee's public pension contract terms may be modified only for limited purposes. *Id.* at 701. Any such modifications must be for the sole purpose of ensuring the continued flexibility and integrity of the pension system. *Id.* Moreover, any modifications that have the effect of reducing a pension benefit or have an adverse effect on members must be counterbalanced by a corresponding increase or additional benefit. *Id.* While the three-prong contract impairment test "forms the backbone of the analysis in pension cases," the analysis of substantial impairment

19

is guided by the principles set forth in *Bakenhus* and its progeny. *WEA I*, 181 Wn.2d at 244, 249.

### A. Scope of Contract Rights

Both parties acknowledge that the WSPRS statutes create enforceable contract rights. Br. of Resp't at 40; Br. of Appellant at 24-25. The disagreement between the parties stems from differing views on how those contract rights are defined. Lenander argues that he has a constitutionally protected contract right to the three percent reduction factor set forth in the initial Option B regulations. Br. of Appellant at 31. The DRS disagrees and argues the contract is limited to the right to an "actuarial equivalen[t]" benefit, subject to the DRS's authority to periodically update its actuarial factors. Br. of Resp't at 42.

The terms of the retiree's pension contract rights, and any limitations on those rights, are defined by the language of the statutes creating those rights. *WEA I*, 181 Wn.2d at 244-45. Thus, we look to the relevant statutes defining Lenander's vested pension benefits.

A public employee's right to a pension vests at the time the employee commences service, and thereafter may be modified only for limited purposes. *Bowles*, 121 Wn.2d at 65. Thus, Lenander's contractual right to a pension benefit vested at the time joined the Washington State Patrol in 1987. *See* AR at 4. At that time, there was only one method for the payment of pension benefits to WSPRS members (what is today referred to as Option A). RCW 43.43.260. The legislature did not add the option to choose a full survivor benefit retirement allowance until 1999, after Lenander's rights had vested. LAWS OF 1999, ch. 74, § 4.

20

Once pension contract rights vest, the State cannot alter the contract without mutual consent. *Wash. Fed'n of State Emps. v. State*, 98 Wn.2d 677, 686, 658 P.2d 634 (1983). However, where the change is favorable to the employee, we will imply consent to the contract's modification. *WEA I*, 181 Wn.2d at 250. Whether a change is favorable involves a fact-specific analysis based on the totality of the circumstances. *Id.* Because this new survivor benefit option allowed greater flexibility to members upon retirement, it was a favorable change to which Lenander's consent may be implied. *Id.*

However, this new contract right was both defined and limited by the statutes that created and governed the implementation of the new benefit. *See id.* at 249. In *WEA I*, we used ordinary principles of statutory interpretation to give effect to a reservation clause included within a pension benefit statute as a term within the pension contract itself. *See id.* at 244-45, 247. We held the legislature's exercise of this reserved authority to repeal a newly added benefit did not constitute impairment of a contract but, rather, constituted the exercise of a contractual provision of the established pension contract. *Id.* at 245. Thus, we must read the pension benefits set forth in the WSPRS Plan 1 statutes in conjunction with any clear statutory provisions allowing for future amendments to those benefits.

At the time the legislature granted a right to select an "actuarial equivalent" survivor benefit for WSPRS Plan 1, it did so subject to the statutory scheme for assessment, adoption, and revision of actuarial factors by the DRS. Prior to adding this new benefit, the legislature required the state actuary to conduct periodic evaluations of each of the state retirement systems and required the DRS to adopt such actuarial factors and regulations as were deemed necessary in light of the study's results. LAWS

OF 1989, ch. 273, § 9 (codified at RCW 41.45.090). The process for reviewing and updating the actuarial calculations for the "actuarial equivalent" benefit was part of the contract terms to which Lenander was deemed to have consented.

Once again, we find our decision in *King County Employees' Ass'n* controlling. In that case, we held that the statutes giving state employee retirement system members the option to select an "actuarial equivalent" annuity benefit established a contractual right only to a "'benefit of equal value' to his or her accumulated contributions," and did not create a right to a benefit calculated based on any particular set of mortality tables adopted by the board. *King County Emps.' Ass'n*, 54 Wn.2d at 9. Because the statutory scheme contemplated the periodic updating of actuarial factors, "[a]ny computations based upon mortality tables rejected by the board—because from experience and actuarial investigation they did not properly reflect the life expectancy of retiring members—would be actuarially unsound, and would not give the employees what they had contracted for." *Id.*

Thus, we hold that based on the WSPRS and the DRS statutes, Lenander has a contractually protected right to a retirement allowance for life, computed based on years of public service and final average salary. RCW 43.43.260, .270. And he has the right to select a survivor benefit that is of equal value, subject to the DRS's authority to update the actuarial factors involved in that calculation of equivalency. RCW 43.43.278. But Lenander did not have a vested contract right to the three percent actuarial reduction first used by the DRS.[9]

---

[9] Lenander asks this court to adopt the reasoning of the Alaska State Supreme Court in *Sheffield v. Alaska Public Employees' Ass'n*, 732 P.2d 1083 (1987), in which the Alaska

Lenander argues that the long-standing use of the three percent factor by the DRS gave rise to a constitutionally protected contractual right based on our decision in *Bowles v. Department of Retirement Systems*, 121 Wn.2d 52, 847 P.2d 440 (1993). In *Bowles*, members of the "Public Employees' Retirement System Plan I" challenged the DRS's decision to discontinue its practice of including leave cash outs in the calculation of average final compensation. *Id.* at 57, 68. This policy shift resulted in lower average final salary calculations, and smaller pension benefits as a result. We held this long-standing administrative practice, which continued for somewhere between 4 and 10 years, created an enforceable contract right, and the abandonment of this policy constituted a contract clause violation. *Id.* at 68.

In this case, unlike *Bowles*, the statutes carve out and retain for the DRS the authority to periodically update actuarial regulations. *See* RCW 41.45.090, .050. Lenander did not have an enforceable contract right to the use of the specific three percent actuarial factor, even though it was used for nearly 10 years, because the use of this factor was always subject to periodic updating. *Accord King County Emps.'*

---

Supreme Court held that the modification of actuarial adjustments to a similar pension statute benefit violated the contract clause of the Alaska Constitution. However, in doing so the Alaska Supreme Court discussed and expressly rejected the approach to contract clause analysis we took in *King County Employees' Ass'n*. *Id.* at 1086-87. The rationale in *Sheffield* is incompatible with our binding precedent in *King County Employees' Ass'n* and *WEA I*, 181 Wn.2d at 244-45, where we gave effect to statutory provisions granting authority to adopt future regulations as part of the contract terms. Lenander has argued that *King County Employees' Ass'n* was wrongly decided. Wash. Supreme Court oral argument, *Lenander v. Wash. State Dep't of Ret. Sys.*, No. 92791-9 (May 10, 2016), at 13 min., 10 sec., *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. However, we generally will not overturn precedent unless there has been a "clear showing that an established rule is incorrect and harmful." *See In re Rights to Waters of Stranger Creek*, 77 Wn.2d 649, 653, 466 P.2d 508 (1970). We find no evidence that this interpretation is either harmful or incorrect. Accordingly, we reject the reasoning of the Alaska Supreme Court in *Sheffield*.

*Ass'n*, 54 Wn.2d at 9 (no contract right to specific actuarial factor when the factors were subject to regular updating). He was entitled only to the standard retirement allowance or the option of an "actuarial equivalent" allowance with a full survivor benefit, subject to the DRS's right to adopt new actuarial factors. *Accord id.* (defining the contractual right as a right "to 'a benefit of equal value'" to his or her contributions, paid on a monthly basis over the remainder of his or her life).

### B. Substantial Impairment

Substantial impairment is measured by the implied consent and comparable new advantages analysis established in *Bakenhus*. *WEA I*, 181 Wn.2d at 249. "'A contract is impaired by a statute which alters its terms, imposes new conditions or lessens its value.'" *Wash. Fed'n of State Emps.*, 127 Wn.2d at 563 (quoting *Caritas Servs., Inc. v. Dep't of Soc. & Health Servs.*, 123 Wn.2d 391, 404, 869 P.2d 28 (1994)). The *Bakenhus* requirements of flexibility, integrity, and comparable new advantages focus this analysis for pension contract cases. *WEA I*, 181 Wn.2d at 244. "'Impairment may be substantial if the complaining party relied on the supplanted portions of the contract.'" *Wash. Fed'n of State Emps.*, 127 Wn.2d at 563 (quoting *Caritas Servs., Inc.*, 123 Wn.2d at 405).

Based on the plain statutory language, Lenander's pension contract rights were not impaired by the DRS's 2010 rule changes. The adoption of updated actuarial factors was simply an exercise of an existing provision to the pension contract. RCW 41.45.090; *see also WEA I*, 181 Wn.2d at 247 (because the legislature included a valid reservation clause, the State did not violate any vested rights of the employees when repealing the additional cost of living adjustment benefit); *King County Emps.' Ass'n*,

54 Wn.2d at 9 (no contract impairment because new actuarial factors merely assured right to "'benefit of equal value'" was met).

Under the pre-2010 and post-2010 regulations, WSPRS Plan 1 members were still entitled to receive a retirement benefit based on the same calculation of average final salary and years of service. RCW 43.43.270. The change in actuarial reduction factors did not alter the value of this substantive retirement benefit but, rather, how that benefit was to be paid out over the lifetime of the member and his or her spouse so as to be a benefit of "equal value" in light of accurate, current actuarial assumptions. This is different from *Bowles*, where the administrative policy shift actually modified the value of the underlying pension benefits received by changing the underlying valuation of "average final salary." *See* 121 Wn.2d at 64. In Lenander's case, the underlying value of the WSPRS retirement benefit—calculated based on average final salary and years of service—has not changed as a result of the newly adopted actuarial tables.

Furthermore, the adoption of new actuarial factors fulfilled the *Bakenhus* principles of providing increased flexibility and integrity to the system. *See* 48 Wn.2d at 701. By adopting a table of factors that vary by age differential, the DRS has created a valuation that more closely approximates the actuarial value of the retirement benefit and, as a result, provides better funding to the WSPRS pension system. CP at 27 (memo from the DRS explaining rationale for adopting new actuarial table based on age differential). The DRS did not infringe on Lenander's right to an "actuarial equivalent" survivor benefit, and because the *Bakenhus* requirements are satisfied, we hold Lenander has not suffered substantial impairment to his pension contract rights.

Because we hold there was no substantial impairment, we need not reach the third prong of the contract impairment test. *WEA I*, 181 Wn.2d at 224.

V.   Attorney's Fees

Lenander requested an award of attorney's fees on three separate grounds: RCW 49.48.030, RCW 4.84.350(1), and the common fund doctrine. Br. of Appellant at 31-34. Because Lenander is not the prevailing party, he is not entitled to fees and we decline to consider the merits of his fee requests.

## CONCLUSION

The DRS acted within its authority in amending the WSPRS Plan 1 Option B survivor benefit actuarial reduction regulations as set forth under former WACs 415-02-380 (2010) and 415-103-215 (2010). In amending these regulations, the DRS did not violate the contract clause of article I, section 23 of the Washington Constitution. We affirm the decision of the superior court.

_____
Wiggins, J.

WE CONCUR.

_____
Madsen, C.J.

_____
Johnson, J.

_____
Owens, J.

_____
Fairhurst, J.

_____
Stephens, J.

_____
González, J.

_____
Gordon McCloud, J.

_____
Yu, J.

27